511 So.2d 1346 (1987)
Arthur K. LOVETT, d/b/a Dixie Dandy
v.
E.L. GARNER, INC.
No. 56782.
Supreme Court of Mississippi.
July 29, 1987.
*1347 David K. McGowan, Jackson, for appellant.
Cliff Finch, Batesville, for appellee.
Before HAWKINS, P.J., and ROBERTSON and ANDERSON, JJ.
ROBERTSON, Justice, for the court:

I.
This is a breach of contract action. Each party  a convenience store retailer and its gasoline supplier  has charged the other with breach. Respecting familiar limitations upon our scope of review, we decline to disturb the lower court's decision that the retailer was the breaching party.
Damages are another matter. The supplier adequately proved damages for abandonment and removal of its equipment from the retailer's premises. The evidence of loss of future profits, however, was too speculative. We affirm in part and reverse in part and render.

II.

A.
Arthur K. Lovett lives in Richton, which is in Perry County, Mississippi, where he has what is commonly known as a convenience store, operating under the trade name of Dixie Dandy. Lovett is assisted in this business by his son, Samuel M. Lovett. Arthur K. Lovett was the Defendant below and is the Appellant here. Lovett's contract for the purchase of gasoline for resale to the public is the subject matter of this civil action.
E.L. Garner, Inc. is a Mississippi corporation having its principal place of business in Batesville, Mississippi. Garner was the Plaintiff below and is the Appellee here. Garner is a jobber and wholesaler of petroleum products. President and chief executive officer of the Garner corporation is Lee Garner.
On January 5, 1983, Lovett and E.L. Garner, Inc. entered into a written contract entitled "Commission Marketing Contract." Under this contract Garner agreed to install certain gasoline dispensing equipment upon Lovett's premises in Richton and agreed to supply gasoline to Lovett which Lovett in turn was to sell at retail to the public "at prices established by Garner." Under the contract Garner would pay to Lovett one-half of the net profits on all gasoline Lovett sold to the public, provided *1348 that Lovett would be guaranteed a minimum profit of four cents per gallon sold. The contract called for a five year term.
Principally at issue are two contemporaneous verbal agreements. First, notwithstanding the control which the written contract gave Garner of the pricing of the gasoline, Lovett argues that Garner agreed verbally that he would set gasoline prices so that Lovett would be "competitive" with retail gas stations in the nearby towns of Runnelstown and Petal. Garner denies any such agreement. Instead, Garner, acknowledging that the subject was discussed, said that he would keep Lovett as low as any independent in Richton and that "we would stay as close as we could to those other areas."
The issue arises in the context of Lovett's claim that Petal and Runnelstown are a part of the Richton market area. Lovett reasons that many residents of Richton, a small town of some 1,200 people, work in Hattiesburg and that on the way to and from work they pass through Runnelstown and Petal, and that if gasoline is two cents lower in Runnelstown or Petal, Richton residents will purchase their gas there and not in Richton. By the map, Richton lies on Highway 42 some twenty-six miles east of Hattiesburg. Petal is some four miles east of Hattiesburg also on Highway 42. Runnelstown is fifteen miles east of Hattiesburg, also on Highway 42. McNally, Road Atlas 52 (1981).
The second verbal agreement concerns Lovett's prior supplier, Clark Oil Company. Lovett contends that, as a condition precedent to his contract with Garner becoming effective, Garner had agreed to take care of any outstanding indebtedness or claims Clark may assert arising out of Lovett's termination of his relationship with Clark. Garner does not dispute this agreement. Indeed, the record reflects that Garner has stated at all times that it would settle with Clark, and if unable to do so, would indemnify and hold harmless Lovett and his corporation "from any judgment and litigation expenses related to Clark Oil Company's claim." Although considerable settlement negotiations have taken place, it appears that the Clark matter remains open, and that Garner remains firm in his acknowledgment of his indemnity obligation.
As fate would have it, the Lovett-Garner relationship was neither prosperous nor tranquil. Garner made Lovett wholly competitive with other Richton independent gasoline stations but Lovett's retail prices to the public remained several cents higher than those available in Runnelstown and Petal for comparable types of gasoline. Lovett's unhappiness was exacerbated by his awareness that Garner controlled stations in Runnelstown and Petal. Specifically, Lovett's price for regular gasoline was 104.9 cents per gallon, while Garner-controlled stations in Hattiesburg were selling regular gas at 102.9 and 103.9 cents per gallon. Garner's Runnelstown stations were selling regular gas at 102.9 cents per gallon. The prices at which Lovett was able to sell unleaded gasoline were also higher than prices at which other stations in the trade area were selling unleaded regular.
In any event, on March 8, 1983, just over two months after the contract was signed, Lovett gave notice that he considered Garner had breached his contract by failing to supply gasoline at competitive prices. Lovett maintained that he was losing money because he was not able to compete with Runnelstown and Petal. Personally and through counsel the parties attempted to resolve their differences over the next five or six months until finally in early September of 1983 Lovett declared the contract terminated once and for all and began buying his gasoline from another supplier.

B.
Several weeks later, E.L. Garner commenced this civil action by filing its complaint in the Chancery Court of Perry County, Mississippi, naming Lovett as the sole Defendant. Garner charged Lovett with breach of the January 5, 1983, contract and sought damages for the cost of removal of equipment, losses as a result of abandonment of contract, loss of anticipated revenues, and attorneys fees.
*1349 Lovett answered and counterclaimed, alleging that Garner, not Lovett, had breached the contract, and praying substantial damages of and from Garner.
The matter was called for trial in Chancery Court on May 9, 1984, at the conclusion of which the matter was taken under advisement, and on March 28, 1985, the Chancery Court rendered its final judgment wherein it found that Garner "had made a substantial performance of said contract and agreement" but that Lovett had "materially breached the ... [contract] by refusing to accept delivery of gasoline from ... [Garner]." The Court further found that, as a consequence of Lovett's breach, Garner had suffered damages in the amount of $50,826.66 computed as follows:
(a) Loss of anticipated revenue  $38,615.16;
(b) Loss as a result of abandonment  $7,211.50;
(c) Cost to remove equipment  $5,000.00.
Beyond that, Lovett was ordered to pay to Garner the sum of $5,000.00 "as contribution to his attorneys fees." Having found that Garner had substantially performed its obligations under the contract, Lovett's counterclaim was dismissed.
Lovett now appeals to this Court, challenging the Chancery Court's decision both with respect to the breach of contract issue and the damages award.

III.
As will presently be apparent, much of Lovett's appeal consists of challenges to the Chancery Court's express and implicit findings of fact  those regarding the terms of the verbal side agreement, the matters of whether Lovett or Garner breached the contract, and regarding damages. Our scope of review of such findings of fact is as familiar as it is limited.
Because Lovett has so strongly challenged the factual premise upon which the final judgment against him rests, we would remind him that upon this appeal we must accept as true the evidence which supports or reasonably tends to support the findings of fact made in the Chancery Court. Likewise, we must accept all reasonable inferences which are consistent with the judgment and which may be drawn from the testimony and the exhibits. Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983); Blakeney v. Blakeney, 244 So.2d 3, 4 (Miss. 1971). If, when we review the evidence in this light, we find that there is substantial evidence which would support and is consistent with the findings made by the Chancery Court, those findings are thus placed beyond our authority to disturb. Norris v. Norris, 498 So.2d 809, 814 (Miss. 1986); Kelly v. Shoemake, 460 So.2d 811, 817 (Miss. 1984); Culbreath v. Johnson, 427 So.2d 705, 707-08 (Miss. 1983); Richardson v. Riley, 355 So.2d 667, 668-69 (Miss. 1978).
There is a corollary principle which need also be noted. With respect to issues of fact where the Chancery Court made no specific finding, we are required by our prior decisions and by sound institutional considerations to proceed on the assumption that the court resolved all such fact issues in a manner consistent with the express finding and with the final judgment. Brown v. Williams, 504 So.2d 1188, 1191 (Miss. 1987); Rives v. Peterson, 493 So.2d 316, 317 (Miss. 1986); Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983).

IV.

A.
Incident to execution of the formal written contract of January 5, 1983, there was considerable discussion regarding the competitive pricing matter, a matter, to be sure, not mentioned in the formal written contract. As that written document contains no language in any way precluding a contemporaneous oral side agreement, the judicial task is determination of the point of fact: What was the side agreement?
Lovett says the side agreement was that Garner would make Lovett competitive. We are less than clear just what "competitive" means, even assuming the correctness of Lovett's version of the facts, for it is far less than certain that "competitive" within the agreement extended beyond the *1350 city limits of Richton nor is it clear that "competitive" meant that Lovett would be able to sell at exactly the same prices as other stations in Runnelstown and Petal. Lovett's brief, notwithstanding its verve and style, is less than helpful, for it speaks constantly in terms of what Lovett would have agreed to saying next to nothing about what he did agree to, the point apparently being that no rational person in Lovett's position would enter the agreement Garner argues for, therefore, we should find as a fact that Lovett didn't enter any such agreement, for surely he is a rational person. This is not the way contracts law works. We are concerned with what the real Lovett did agree to, not with what a rational Lovett would have agreed to.
All of the sound and fury aside, we find the matter of necessity controlled by limitations upon our scope of review discussed in Section III above. Looking at the evidence offered by Garner, two things are clear: Garner never agreed to sell to Lovett on such terms as would enable Lovett to sell gasoline at the pump at the same price as in Petal and Runnelstown. Second, Garner did sell to Lovett on terms that enabled Lovett to be competitive within the town of Richton.
The Chancery Court found that Garner "had made a substantial performance of said contract and agreement." It would have been most helpful had the Chancery Court made an express finding regarding the terms of the verbal side agreement between Lovett and Garner and then made findings as to whether those terms had been breached. Consistent with established principles regarding our scope of review, however, we must treat the final judgment as having resolved against Lovett the matter of whether there had in fact been an agreement to sell to Lovett on such terms that he could in turn sell gas at the pump at the same price as Runnelstown and Petal. In view of the evidence that Garner did sell to Lovett on a basis that allowed Lovett to sell at the same price as others in Richton and at approximately two cents higher than those in Runnelstown and Petal, we are of the opinion that there is in this record substantial evidence undergirding the final judgment and placing it beyond our authority to disturb, at least on this point.

B.
Lovett next argues quite strongly that Garner breached a second verbal side agreement. Here we refer to the matter of settling up with Lovett's prior supplier, Clark Oil Company. Here we confront a matter not mentioned in the final judgment of the Chancery Court. Nevertheless, there seems no serious dispute regarding the agreement, for Garner does not deny it. Consistent with principles of review announced above, we hold that Garner effectively bound itself to satisfy Lovett's obligations to Clark arising out of Lovett's termination of his relationship with Clark and that Garner was obligated to indemnify and hold harmless Lovett and his corporation from any judgment and litigation expenses related to the Clark Oil claim.
Lovett makes much of the fact that Garner has never settled with Clark. We have searched the record in vain for any evidence that Garner has in any way attempted to renege on its obligation with respect to the Clark claim. Garner claims that Clark is asserting a grossly inflated claim and that it will pay any just claim or any claim asserted by Clark which is reduced to judgment against Lovett. When Garner adds an indemnity agreement with respect to litigation expenses, it is difficult to understand how Lovett can complain.
To be specific, we find no evidence that Garner obligated itself to pay any amount Clark might demand, nor is there any evidence that Garner has failed and refused to pay any claim which has been reduced to judgment. This assignment of error is denied.

C.
Turning to the question of whether Lovett breached the January 5, 1983, contract, we find no serious dispute that, beginning in September of 1983, Lovett refused to accept any more gasoline from *1351 Garner and that Lovett did in fact start purchasing gasoline from another supplier. Lovett breached his contract with Garner and does not seriously suggest to the contrary, arguing only that his actions were justified by alleged prior breaches by Garner. Because we have determined the Chancery Court's decision respecting Lovett's claims of breach without merit, it is a short step to affirming the Chancery Court's finding that Lovett
materially breached the Commission Marketing Agreement between the parties dated January 5, 1983, by refusing to accept delivery of gasoline from the plaintiff, E.L. Garner, Inc., and by subsequently removing the plaintiff's gasoline pumps.

V.

A.
We turn now to the matter of damages. Lovett argues that the Chancery Court erred in determining the amount of damages, primarily for the reason that Garner's proof of damages was impermissibly speculative. Lovett further contends that the documents produced by Garner outlining the amount of damages claimed were not properly qualified before being received into evidence. The latter of these contentions will be discussed first.
During its case-in-chief, Garner produced Exhibit P-2, which was a composite of losses it allegedly sustained as a result of Lovett's breach of contract. This exhibit was offered through witness Billy Mack Smith, who was working for Garner as manager of marketing and sales at the time the Lovett-Garner problem arose. The Chancery Court admitted the composite of losses, ruling:
I am going to allow it at this time on the basis that this is what the plaintiff is basing its claim upon and for use by the Court after I have all the evidence in. I think otherwise I would be amiss in reviewing all the information because they have alleged in not too specific terms in their amended bill what the damages are, and I'd like to see what they are claiming. For that reason, and I wanted to explain in the record, and so both of you would understand why I'm going to allow it. And I will allow it in evidence.
Lovett challenges the admissibility of this composite based on the grounds that Garner's attorney laid no predicate for introduction of the document. Specifically, Lovett argues that the document was not properly qualified because no records upon which the document was based were offered nor were any witnesses offered who prepared the figures in the document.
Billy Mack Smith testified that he reviewed the figures in Exhibit P-2 after those figures had been prepared at Garner's offices. He testified that he verified the figures and reviewed all the material upon which Exhibit P-2 was based. His records reveal that the amounts in P-2 were paid by Garner. Based on this testimony, we hold the Chancery Court was within its authority when it ruled that Smith sufficiently authenticated the exhibit as being a composite of losses suffered by Garner.[1]

B.
Lovett challenges the Chancery Court's award of costs included in Exhibit P-2 as "loss from abandonment" and "removal costs." Garner claims that it incurred substantial costs in installing equipment and fixtures contemplated by the Commission Marketing Agreement. When Lovett breached, many of these improvements had to be abandoned, and costs incident thereto proved unrecoverable. Specifically, Garner estimated that it lost $7,211.50 in abandonment costs as a result of Lovett's breach of contract. This amount was based upon an invoice delineating the amount of concrete Garner used on Lovett's premises ($1,711.50) and estimates as to the dollar amount of miscellaneous materials used and labor and overhead costs.
*1352 Lovett has no quarrel with the amount spent on concrete as evidenced by the invoice. Instead, Lovett argues that Garner's proof of concrete cost via the invoice illustrates the very problem with other estimated costs  lack of documented proof establishing a reasonable certainty of damages. Lovett argues that the $500.00 for miscellaneous materials and $5,000.00 for labor costs incident to installing equipment and fixtures on Lovett's premises were merely nice round figures pulled out of someone's head, not substantiated by an independent estimate or invoices. Therefore, Lovett argues that $5,500.00 of the $7,211.50 was merely speculative and the Court was wrong in awarding such damages.
The record reflects that the cost of "miscellaneous materials" and "labor and overhead" was established by an estimate provided by Sidney Cook, the person in charge of construction for Garner. Cook explained the $500.00 figure for miscellaneous items as follows:
... I put $250.00 worth of 2X4s in there that Mr. Lovett wanted in there for expansion joints  cedar 2X4s that I bought. And, of course, there was at least four rolls of wire mesh there, and they don't even have the gas pipe included in there or the conduit or anything like that.
As to the $5,000.00 labor and overhead cost estimate, Cook explained that it cost him $1,000.00 per day for his crew to operate. Cook testified that he and his men worked more than five days on this particular job, but he charged the minimum and estimated that to be $5,000.00.
The cost of the concrete plus the estimates pertaining to miscellaneous materials and labor cost constituted the "loss from abandonment" damages. As to the "removal costs" of $5,000.00, Charles Blalack, the comptroller for Garner, testified that this figure was computed after conferences with Cook and wherein the two estimated what they reasonably thought it would cost to remove the Garner equipment from Lovett's premises. Their estimates were not based on any physical documents or any precise dollar figures.
Damages for breach of contract must be proven "with reasonable certainty and not based merely on speculation and conjecture." Burnham v. Joseph, 482 So.2d 1151, 1153 (Miss. 1986). This rule is not limited to damages for breach of contract, but includes damages generally. See Hudson v. Farrish Gravel Co., 279 So.2d 630, 635-36 (Miss. 1973); Dennis v. Prisock, 254 Miss. 574, 583, 181 So.2d 125, 128 (1965) on appeal after remand, 221 So.2d 706 (Miss. 1969); Chevron Oil Co. v. Snellgrove, 253 Miss. 356, 367, 175 So.2d 471, 475 (1965).
In short, our inquiry is whether the estimates provided by Garner regarding the miscellaneous materials and labor costs under the "loss from abandonment" category and the "removal costs" category established with reasonable certainty the damages Garner suffered in these categories. We hold Garner's evidence sufficient unto the day. While not precise, the abandonment and removal cost figures were reasonable. They were subject to cross-examination which failed to establish that they were out-of-line. The abandonment and removal damages were proved with reasonable certainty and were not based on mere speculation and conjecture, or at least the Chancery Court had authority to so hold.

C.
Loss of future profits is another matter. Lovett and Garner operated under their Commission Marketing Contract from January  September 1983. Garner computed loss of future profits by taking one-half of the net profits from the Commission Statements for January  September 1983, adding the sums from each month to arrive at a total, and then dividing this total by the number of months (nine) to obtain a monthly average. This average was then multiplied by the remaining months in the contract (51) to arrive at the total used by the court, $38,615.16.
Lovett first argues that Garner failed to incorporate several variables such as inflation, inconsistency of sales and mitigation of damages into its calculation of future profits. Further, Lovett contends that *1353 Garner committed two fatal errors in its calculation. Specifically, Lovett argues that Garner totally ignored the four cent per gallon guarantee in the Commission Marketing Contract. That is, Garner's calculations were based solely on one-half of the net profit attained for the nine months that the parties operated under the contract. Lovett points out that he is entitled to at least a four cent per gallon guarantee each month and by not figuring this guarantee into its calculations, Garner's totals reflect a far greater profit than it would ever be entitled to actually collect because of the four cent guarantee. Also, Lovett points to the failure of Garner to reduce its calculations to present value for a five year lease term as opposed to a twenty year term, or even a fifteen year term, which Garner later requested from its economist.
In Mississippi, one may recover for loss of future profits in a breach of contract action as long as such profits are proved with reasonable certainty, not based on speculation or conjecture. See McCain v. Cox, 531 F. Supp. 771, 783 (N.D.Miss. 1982) affd. 692 F.2d 755 (5th Cir.1982); United States Finance Co. v. Barber, 247 Miss. 800, 812, 157 So.2d 394, 398 (1963); Mississippi Power Co. v. Cochran, 167 Miss. 705, 713, 147 So. 473, 475 (1933); Yazoo & MVR Co. v. Consumers Ice and Power Co., 109 Miss. 43, 47, 67 So. 657, 658 (1915); Crystal Ice Co. v. Holliday, 106 Miss. 714, 721, 64 So. 658, 660 (1914); Railraod Co. v. Ragsdale, 46 Miss. 458, 483 (1872). In calculating loss of future profits, such loss is that of net profits as opposed to gross profits. Dunn, Recovery of Damages For Lost Profits 3d, § 6.1 (1987); see also Cook Industries, Inc. v. Carlson, 334 F. Supp. 809, 816 (N.D.Miss. 1971). To ascertain net profits, a party must deduct such items as overhead, depreciation, taxes and inflation. Dunn, § 6.4  6.9. Further, future profits should always be discounted at an appropriate rate to arrive at present value. Dunn, § 6.14. And, finally, the plaintiff must mitigate damages if he is able to do so. Dunn, § 6.19.
There are no guidelines set in stone specifying the degree of certainty that we require of parties in proving loss of future profits. Indeed, the degree of proof required usually depends on the particular facts of the case. See Note, The Requirement of Certainty and the Proof of Lost Profits, 64 Harv.L.Rev. 317, 319 (1950). One guideline frequently recognized by this Court is a party's proof of its past profits. See Sanders v. Dantzler, 375 So.2d 774, 777 (Miss. 1979); Mississippi Power & Light Co. v. Pitts, 181 Miss. 344, 362, 179 So. 363, 366 (1938). In the instant case, Garner utilized past profits, but in a way that was misleading. Indeed, as Lovett points out, he was entitled to a four cent per gallon guarantee. As such, Garner was not necessarily entitled to one-half of the net profits per month. Instead, Garner was entitled to what was left over after Lovett received his four cent per gallon guarantee, regardless of whether that constituted one-half of the net profits or not. Accordingly, although Garner based its projection of future profits on its past profits, such projections were misleading and resulted in inaccurate amounts for future profits.
There are additional problems with the Chancery Court's award of damages for loss of future profits. Variables such as inflation, market availability, etc. were not considered in the damages calculation. The future profits arrived at were not discounted to present value based on a five year lease term. Since the chancellor based the award on the "primary five year period of the contract," present value should have been determined accordingly. All things considered we regard the proof on loss of future profits quite speculative and, indeed, downright erroneous. That evidence is legally insufficient to undergird a damages award even when considered under established limitations upon our scope of review as indicated above. We reverse the award of damages for loss of future profits and on that issue render judgment for Lovett.

VI.
Lovett also challenges the awarding of attorneys fees in the sum of *1354 $5,000.00. Specifically, Lovett argues that the only evidence of attorneys fees was Lee Garner's testimony that by the time the trial was completed he would probably owe his attorney between $4,000.00 and $5,000.00. Indeed, there are no time sheets in the record nor any other evidence indicating the amount of time expended by counsel, nor was there evidence of the reasonableness or necessity of the attorneys fees. We hold Garner's proof on the attorneys fees issue inadequate as a matter of law. See Clark v. Whiten, 508 So.2d 1105, 1108 (Miss. 1987); Gilchrist Machinery Co. v. Ross, 493 So.2d 1288, 1292-94 (Miss. 1986); Bumgarner v. Bumgarner, 475 So.2d 455, 456 (Miss. 1985); McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982) On this issue we reverse and render.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., DAN M. LEE, PRATHER, ANDERSON and GRIFFIN, JJ., concur.
SULLIVAN, J., not participating.
NOTES
[1] Indeed, although not applicable to this case, under the new Rules of Evidence, Smith certainly seems to be a witness with knowledge sufficient to establish that this composite of losses was what it purported to be. See Rule 901, Miss.R.Ev.