514 So.2d 778 (1987)
Hugh H. LEARD and Lillian C. Leard
v.
Wesley B. BRELAND and Beverly I. Breland.
No. 57004.
Supreme Court of Mississippi.
October 28, 1987.
*779 Dudley W. Conner, Hattiesburg, W. Joel Blass, Mize, Thompson & Blass, Gulfport, for appellant.
Thomas M. Matthews, Jr., Parsons & Matthews, Wiggins, for appellee.
En Banc:
PRATHER, Justice, for the Court:
The measure of damages to a growing crop is the central issue addressed in this opinion. This appeal arises from a decision of the Chancery Court of Stone County, Mississippi wherein Hugh H. Leard and his wife, landowners and defendants below, were found to have breached a lease contract entered into with their lessees, Wesley B. Breland and his wife, plaintiffs below. The Leards appeal assigning the following errors:
(1) The finding of the learned chancellor is contrary to the overwhelming weight of the evidence.
(2) The learned chancellor erred in failing to recognize the obligations undertaken by the parties in their lease contract or agreement as written.
*780 (3) The lower court erred in failing to find for the appellants and in failing to award them damages as shown by the evidence to repair the damage caused by lessees' failure to comply with the lease.
(4) The lower court failed to comply with the maxims of equity.
(5) Even if the plaintiffs were entitled to prevail, which the appellants deny, the learned chancellor erred in applying the proper measure of damages.

I.
On September 29, 1981 the parties above entered into an agricultural lease agreement covering 260 acres of crop land owned by the Leards in Stone County, Mississippi. The lease, prepared by Leard, was for a term of three years beginning January 1, 1982 and ending December 31, 1984. The litigation arose when the Leards exercised their right of re-entry for condition broken after the Brelands allegedly failed to comply with the paragraph of the lease pertaining to the use, maintenance, care, waste and rent of the land.
The bi-annual lease rental payment of $5,460.00, due January 1, 1982 was paid by Breland. Payments made during the first lease period exceeded the initial installment due by approximately $1,000. Leard granted Breland an extension of time for rent payment due on June 15, 1982 until August 10, 1982, and a further extension of the August 10th payment to November 1, 1982. Breland testified that he paid additional monies to secure extensions and that Mr. Leard had agreed and typed documents to verify the extensions.
Breland testified that he and Leard got along well and that Leard was satisfied with Breland's performance and his decision to allow all but 85 acres of the crop land to remain fallow for the summer crop year of 1982. Breland disked all the acreage twice and was going to disk the property a third time in mid-October. A large volume of soybean stem and weed residue left windrowed on the property by a prior lessee had caused extensive problems for him in tilling the soil.
Although all the land was not placed in crops during the initial summer, Breland testified that he cultivated the soil, and prepared it for later crop production. Breland further claimed that he had cleared a 20 foot road-bed as required by the lease. Breland submitted documents to indicate that the property had been fertilized and that lime had been applied which had a useful life of two to three years.
To the contrary however, Leard testified that he contacted Breland soon after Breland's possession of the land to point out ditches, grass waterways and terraces to be maintained. Yet, testified Leard, Breland failed to comply with his instructions. Leard contends that as late as May, 1982 Breland had done nothing to prepare the soil for soybean crop, normally planted in April, May or June. The crop was planted in late June and early July. Although the lease required no specific acreage of land to be planted nor that any maintenance be performed within a specific time Leard testified that he was concerned about the condition of the land, the failure to plant other acreage of the land, the failure to control weeds, brush, and erosion, and the payment of rent.
Breland, however, testified that there were no problems between himself and Leard until sometime around September 25, 1982, when Leard learned that Breland had Federal Crop insurance and Leard insisted that Breland assign the benefits payable under the insurance policy to him. Breland refused.
On September 30, 1982 Leard mailed Breland a copy of a letter written by Leard to Mr. James J. Riley with All-Risk Crop Insurance. The letter indicated that Breland was past due on rental payments and that Leard intended to exercise his right of re-entry to harvest the crops as provided in the lease agreement.
On October 4th Leard wrote Breland that he would make immediate re-entry for the purpose of harvesting the crop. Breland testified that that very same day, he went to the farm and saw Leard's workmen cutting the immature soybean crop for hay. Leard sold the hay and retained the proceeds. *781 Breland filed this action for breach of the lease agreement alleging that the Leards were in direct violation of the lease and had caused damages in the approximate sum of $90,000. The lower court found in favor of the Brelands awarding them damages and possession of the acreage, rent free, pending the resolution of litigation in this case. Counsel represented in oral argument, however, that the landowner has been in possession of the farm land continuously since October 4, 1982, notwithstanding the lessee's award of possession. Therefore, the issues are narrowed to the year 1982.

II.

Was the finding of the chancellor contrary to the overwhelming weight of the evidence and erroneous in failing to recognize the contractual obligations?
At trial, there was sharp conflicting evidence offered on behalf of Breland and of Leard as to the issue of Breland's contractual breach. Leard contends that his act to re-enter upon condition broken was precipitated by Breland's failure to perform the terms of the lease and of his failure to make rental payments on time. Yet the record documents a clear and unambiguous memorandum, signed by both parties, granting an extension for such rental payments. Leard testified that Breland had failed to provide "good husbandry" about the leased premises and to follow Leard's suggestions intended for good crop production, weed control and erosion control.
Witnesses were presented for each side. Several witnesses testified that Breland was practicing acceptable techniques. In fact, one witness testified that Leard, in July of 1982, recommended Breland for a position on an agricultural board because of his farming expertise. Yet other witnesses substantiated Leard's claim that Breland was disking the property in a manner other than on contour, permitting soil erosion, etc.
With regard to Leard's claim that Breland failed to carry out soil enrichment procedures, as contemplated by the "maintenance and care" provision of the lease, Dr. Rasberry of the Mississippi State Horticultural & Agronomy Department stated that the land was in good shape for planting soybeans and had a high rate of fertility. Rasberry further stated that the land was suitable for double cropping, (planting a winter crop as well as a summer crop) and that the soil was better than average.
Although Leard claimed his re-entry did not occur until October 15th, the lower court found that on the date of reentry, the extended due date for payment had not yet tolled and that Breland was not given adequate notice of any alleged default. The lower court found competent evidence to corroborate Breland's contention that he was performing adequately under the lease and that Leard wrongfully interfered with Breland's use of the leased premises.
A review of the record amply supports the trial court's factual findings as reasonable and not clearly erroneous. Findings of fact made by a chancellor cannot be set aside or disturbed on appeal unless manifestly wrong. Lovett v. Garner, 511 So.2d 1346 (Miss. 1987); Harkins v. Fletcher, 499 So.2d 773 (Miss. 1986); Dunaway v. Busbin, 498 So.2d 1218 (Miss. 1986); Spain v. Holland, 483 So.2d 318 (Miss. 1986); Carr v. Carr, 480 So.2d 1120 (Miss. 1985).
Leard contends that Breland contracted to comply with all requirements, covenants and conditions imposed by the lease and that Breland was bound to perform to the standards required in the lease.
It appears that in contrast to the allegations of Leard, the lower court was fully cognizant of the obligations undertaken by the parties. The lower court found no breach on the part of Wesley Breland, but on the contrary found competent evidence to substantiate Breland's alleged efforts to comply with the lease. The lower court did find, however, that Leard breached his obligation to provide proper notice before re-entering the property and claiming control of Breland's soybean crop. These assignments are without merit, but supported by the record on conflicting testimony and the chancellor's factual determinations.

*782 III.

Did the lower court err in failing to find for the appellants and in failing to award them damages to repair the damage caused by lessee's failure to comply with the lease?
In this assignment of error, appellant challenges the ruling of the court and contends that since the chancellor did not state that Breland was in compliance with the lease, the Leards were entitled to re-enter for conditions broken. This assertion, however, ignores the chancellor's ruling that the Leards were found to be in violation of the lease due to inadequate notice. Appellant further argues that the Brelands did not come into the court of equity with "clean hands" and that since Breland failed to object to the sufficiency of notice for re-entry, such failure constituted a waiver. Thompson on Real Property, 1959 Replacement, Sec. 1356, p. 676. The Leards filed suit one month after the dispossession in October, 1982.
This assigned error is without merit.

IV.

Did the lower court fail to comply with the maxims of equity?
The thrust of this argument is that the Brelands cannot seek the aid of a court of equity when his conduct has been characterized by willful inequity. See V. Griffith, § 50 Mississippi Chancery Practice, 433 (2d ed. 1950). Yet, the chancellor's ruling and finding of fact failed to cite any such inequity, and no such inequity appears in the record of this case. Findings of fact made by a chancellor cannot be set aside or disturbed on appeal unless manifestly wrong. Harkins v. Fletcher, 499 So.2d 773 (Miss. 1986). The assignment of error is without merit.

V.

Did the learned chancellor err in applying the proper measure of damages?
The lower court ordered that the Brelands were entitled to their total expenditures prior to being put out of possession, plus the value of the soybeans that were cut.
Damages for breach of contract must be proven "with reasonable certainty and not based merely on speculation and conjection." Lovett v. Garner, 511 So.2d 1346 (Miss. 1987).
The trial court allowed judgment to the Brelands computed as follows:

 Value of soybean crop at rates insured by the Federal
 Crop Insurance Program $9,226.00
 Rent paid, initial payment 6,460.00
 One-half of teledyne payment made for sizmagraph work 775.00
 Road expense 475.00
 Fertilizer expense 1,890.52
 Fertilizer spreading expense 287.80
 Cost of lime 2,852.00
 Cost of seed 986.00
 Cost of Toxaphene 552.50
 Fuel expense 640.20
 _________
 Total 24,145.02

In general "[t]he court's purpose in establishing a measure of damages [for breach of contract] is to restore the injured party to the financial position he would have been in had there been no breach. His recovery is limited to the loss actually suffered by reason of the breach, and he is not entitled to be placed in a better position than he would have been if the contract had been performed." Mid-Continent Telephone Corp. v. Home Telephone Co., 319 F. Supp. 1176, 1198 (N.Dist.Miss. 1970), Mississippi Power Co. v. Harrison, 247 Miss. 400, 152 So.2d 892 (1963).
This Court has held that in the case of growing crops, the computation should be based, although not exclusively, upon the difference between the value of the crop immediately before and just after the damage; but such a rule must be given flexibility to allow consideration of pertinent practical factors dictated by fairness and reason, including the cost of cultivation, harvesting and marketing. Mid-Continent Aircraft Corp. v. Whitehead, 357 So.2d 122 (Miss. 1978).
A sister state has applied the same test in its jurisdiction, but said it in different language. In Cutler Cranberry Co. v. Oakdale Elec. Cooperative, 78 Wis.2d 222, *783 254 N.W.2d 234 (1977) the Wisconsin Court held that damages to a growing crop are computed as follows:
The measure of damages for injury to or partial destruction of a growing crop is the difference between the crop's value immediately before and after the injury or partial destruction. Under this rule, the most generally accepted method for determining damages for such injury to a crop is to compute the difference between the value at maturity of the probable crop if there had been no injury and the value of the actual crop at maturity, less the expense of cultivation, harvesting and marketing that portion of the probable crop which was prevented from maturing.
78 Wis.2d at 229, 254 N.W.2d at 238.
It is this Court's opinion that the chancellor was correct insofar as the expenses awarded were attributable to the fallow property. However, gross profits and expenses attributable to the 85 acres planted in soybeans should not have been awarded. As to the soybean crop, Breland should be compensated for no more than his loss of net profits.
The first issue addressed is the application of the "before and after" rule enunciated in Mid-Continent Aircraft, supra, to the determination of loss of profits in the instant case. The growing crop itself was of no value after destruction because that destruction was complete. Leard not only harvested the crop but also sold it and retained the proceeds. This "after" value is the same as the value of the actual crop at maturity, one of the required determinations in Cutler, supra.
Likewise, the value of the crop before destruction is comparable to Cutler's "value at maturity of the probable crop if there had been no injury ..., less the expense of cultivation, harvesting and marketing that portion of the probable crop which was prevented from maturing." In the instant case, this value at maturity of the probable crop is that of the gross receipts which were reasonably probable before destruction based upon such factors as the quality of the crop before destruction, the market prices at the probable time of harvest, and any insurance.
Based on various testimony, particularly that the crop was of sufficient quality that the insurance would have secured a selling price of $7.00 per bushel, and that the market price would have been below $7.00 at harvest, the chancellor was not manifestly wrong in determining that the gross receipts would have been the minimum $7.00 per bushel times 1,318 bushels, for a gross profit of $9,226.00.
However, the expenses which would have been required to earn that gross profit of $9,226.00 clearly should be deducted therefrom. At the least, direct costs of production must be deducted, that is, those costs Breland would have incurred had Leard not breached the contract and excused Breland's further performance. Dunn, Recovery of Damages for Lost Profits, §§ 6.1, 6.4 (3d ed. 1987).
Some expenses of crop cultivation were already incurred at the time of destruction. The amount of these expenses should not have been awarded because compensation for the crop destruction was to be based upon lost profits and not simply a return of expenses. The chancellor's award of both profit and expenses required to make that profit is a double recovery.
On the other hand, the opposite mistake should not be made. These expenses, which were already paid or incurred, should not be deducted from gross profits because reduction of an award of profits for such expenses has the effect of a double reduction. Breland has already paid these expenses in order to earn his profit; to reduce the actual award of the profit would, in effect, make Breland pay the same expenses twice and would penalize him for taking good care of his crop.
In summary the cost of completion or expenses saved should be deducted from any recovery of lost profits. Dunn, § 6.1; 22 Am.Jur.2d Damages § 178 (1965). The expenses saved include the cost of any continuing cultivation necessary to secure receipt of the insurance proceeds and the costs of harvesting and marketing the crop, *784 as specifically enumerated in Mid-Continent Aircraft, supra, and in Cutler, supra.
The chancellor did not deduct the expenses of continuing crop cultivation, harvesting, and marketing that were saved, and this Court can find no evidence thereof in the record. It is clear that at least two of the three above named costs would definitely have been incurred. Evidence of expenses saved "is part of plaintiff's case and plaintiff must prove it." Dunn, § 6.3. Thus, Breland should have proved that these costs would have been no more than a given amount, thereby reducing his profit by only that amount, which proof could then have been rebutted. This proof of costs can be based upon evidence of average costs for the season on land in the vicinity or of costs on the same land in other years. Cf. Dunn, § 2.28.
As in the case of damages generally, Burnham v. Joseph, 482 So.2d 1151 (Miss. 1986), and the case of loss of future profits, Lovett v. Garner, 511 So.2d 1346 (Miss. 1987), recovery for lost profits will be allowed only if their loss is proved with reasonable certainty. Dunn, § 1.2; 22 Am.Jur.2d Damages § 172 (1965). This Court can only speculate even as to whether any profit at all remains after deduction of expenses saved because those expenses have not been proved.
However, the difficulty of ascertaining the amount of damages will not bar recovery of damages. Burnham, supra. When expected profits are too speculative to be recoverable, the Court may always use as an alternative measue of damages the expenses incurred in preparation for performance or in part performance, that is, expenses already paid by Breland in raising the crop up to the point of destruction. The defaulting party is generally not harmed if the plaintiff recovers only such expenses. If the nondefaulting party would have suffered a net loss, the defaulting party bears the burden of proving the loss and in the absence of such proof, the full amount of the expenses will be allowed. 22 Am.Jur.2d Damages § 161.
Therefore, in the absence of proof of expenses saved, net profits are too speculative to be awarded. Breland has had the chance to prove lost profits and has failed. Therefore, as to the portion of the property which had the growing crop, this Court awards only the amount of the expenses incurred to raise the crop up to the point of destruction. However, this Court also awards expenses attributable to the fallow property, which were clearly incurred in reliance upon the contract, are of no value now to Breland, and were foreseeable by Leard, the defaulting party. Of course, profits are too speculative as to the fallow property. 22 Am.Jur.2d Damages § 159 (1965). Expenses need not be prorated between the property with the crop and the fallow property because this Court awards all expenses already paid or incurred. The resulting amount is equal to the expenses awarded by the chancellor, as enumerated above. When the gross profit of $9,226.00 is excluded from the chancellor's award of $24,145.02, total expenses incurred of $14,919.02 remain.
This Court affirms as to liability, reverses as to damages, and renders damages in the amount of $14,919.02. The Court considers the appellees' right to re-enter the premises as having been abandoned by him.
AFFIRMED AS TO LIABILITY, REVERSED AS TO DAMAGES AND DAMAGES RENDERED IN THE AMOUNT OF $14,919.02.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, ANDERSON and GRIFFIN, JJ., concur.
SULLIVAN, J., not participating.