UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. 98-60716

UNION NATIONAL LIFE INSURANCE COMPANY,

Plaintiff-Appellee-Cross-Appellant,

versus

LESLIE E. SMITH,

Defendant-Appellant-Cross-Appellee.
_____

Appeal from the United States District Court
for the Northern District of Mississippi
(3:95-CV-108-B-A)
_____

March 20, 2000

Before JONES, BARKSDALE, and DENNIS, Circuit Judges.

PER CURIAM:[1]

For this Mississippi diversity action tried to a jury, the principal issues are sufficiency of the evidence for whether Union National Life Insurance Company (UN) defamed its former agent, Leslie E. Smith, and his entitlement *vel non* to compensatory *and* *punitive* damages, notwithstanding the three co-defendant UN employees being exonerated. Smith contests FED. R. CIV. P. 50 judgments as a matter of law (JMOL) holding he breached his contract with UN and setting aside the punitive damages; UN, denial

_____

[1]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

of JMOL on defamation.  Regarding the JMOL on the contract claim and punitive damages, we **AFFIRM**; for defamation, we **REVERSE** and **RENDER**.

## I.

Except for six months in 1981, Smith was employed by UN from 1976 until mid-February 1995; he became its top credit life salesman in three Mississippi counties (Debit 15).  When Smith left UN, his employment contract contained a covenant not to compete for one year in 15 counties in Mississippi, including the three in Debit 15.  This notwithstanding, he continued to solicit in that area for his new employer, Life of Georgia (LG).

In July 1995, UN filed this action against Smith for breach of contract and injunctive relief.  Both UN and LG provided "home service", by which, every week or month, agents visit policyholders, mainly low-income, to collect premiums.  UN claimed that Smith's actions had resulted in the "wholesale destruction" of its Debit 15 business.  (Prior to trial, Smith agreed to a preliminary injunction against his soliciting in that area.)

Smith counterclaimed for defamation, contending that, after he left UN, its employees and agents "planned and implemented a deliberate campaign" to discredit him, by making defamatory statements about him to his customers, inducing them to write and/or sign statements seeking a premium refund from LG, and sending those statements and other correspondence to LG and the

Mississippi Department of Insurance. Named as counterclaim co-defendants were Ozbolt, a UN regional vice president, and two UN agents, McDonald and Brown.

The defamation evidence Smith proffered at trial concerned primarily the co-defendant UN employees' alleged statements to UN policyholders (who had subsequently purchased LG insurance from Smith) that Smith was "stealing from the company" and "going to jail".

At the close of all the evidence, the district court granted JMOL to UN on its breach of contract claim, holding, *inter alia,* that the geographic and time limits for the covenant not to compete were reasonable. The issue of UN's damages was submitted to the jury; it returned a $50,000 verdict for UN.

For Smith's defamation claim, the jury rendered an arguably inconsistent special verdict. As stated in the verdict form, the jury found that "agents of [UN]" *had defamed* Smith. But, it found also that the three co-defendant UN employees (who, as noted, were alleged to have made the bulk of the defamatory statements) *had not defamed him*. The jury awarded Smith $50,000 in compensatory, and $500,000 in punitive, damages.

Post-verdict, Smith moved for JMOL on UN's contract claim and, alternatively, for a new trial. UN did likewise for Smith's defamation claim.

For the several JMOL claims by Smith and UN, the court granted

3

only UN's regarding punitive damages. Noting it was unknown whether the jury found the three co-defendant employees did *not* make the alleged defamatory statements, or found the statements were *not* defamatory, the court held that, *without those statements*, the evidence was insufficient for punitive damages. Concluding that UN's letters to the Insurance Department "comprised the only other evidence ... on which a finding of defamation ... could be made", and viewing the evidence in the light most favorable to Smith, the court upheld the defamation compensatory damages. It ruled, however, that the letters did *not* evidence the requisite malice for punitive damages, because they were "of a business nature", written to the proper governmental agency about a "legitimate concern".

In sum, the court upheld the jury's $50,000 compensatory damages awards: to UN, for Smith's breach of contract; to Smith, for defamation. It also awarded UN $25,000 in attorney's fees and $1,500 for expenses.

## II.

Smith contests the JMOLs regarding insufficiency of the evidence for punitive damages and his breaching his contract; for the latter, he also challenges the resulting damages and attorney's fees. UN contests the denial of JMOL regarding Smith being defamed.

A.

For punitive damages being set aside, Smith maintains the court excluded improperly the evidence concerning the three co-defendant UN employees.  Alternatively, he claims other evidence sufficiently supports the award.

1.

In this regard, he asserts that the court improperly reconciled the verdict.  As with any special verdict, pursuant to FED. R. CIV. P. 49(a), the trial court must "apply[] appropriate legal principles" to the jury's findings, and determine "the resulting legal obligation[s]".  *Freeman v. Chicago Park Dist.*, 189 F.3d 613, 616 (7th Cir. 1999) (internal quotation marks and citation omitted). Consistent with the Seventh Amendment, when a jury's special verdict is apparently inconsistent, we must "make a concerted effort to reconcile [it].... before we are free to disregard [it] and remand the case for new trial".  *Alvarez v. J. Ray McDermott & Co.*, 674 F.2d 1037, 1040 (5th Cir. 1982) (internal quotation marks and citations omitted).

For resolving such conflicts, we must determine whether "the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted"; we will reverse *only* if "there is no view of the case which makes the jury's answers consistent and ... the inconsistency is such that the special verdict will support neither the judgment entered below nor any

5

other judgment". *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir. 1973) (citations omitted). In addition to examining the jury interrogatories, we must consider its instructions, *Alvarez*, 674 F.2d at 1040 (citation omitted), and determine if the reconciliation "is a reasonable reading of the record". *Bingham v. Zolt*, 66 F.3d 553, 563 (2d Cir. 1995).

Smith urges the exclusion of the evidence concerning the three exonerated employees was improper, because the court ignored the possibility the jury found the employees *had* defamed Smith, but meted "lay justice to release [them] from direct responsibility". This verdict-construction, according to Smith, is supported by the jury instructions that (1) the employees acted within the scope of their employment "at all times"; and (2) if the jury found the employees defamed Smith, it "must find in favor of [him] and against [UN] and/or the agent or agents whom you find ... made the defamatory statements", because the "and/or" phrase indicated to the jurors they could find against UN only, *or* UN and the three co-defendants.

Of course, we apply Mississippi law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Smith relies on Mississippi decisions which permit an employer to be held liable *despite* exoneration of its employee, the very person through whom liability is imputed to the employer. *See Capital Transp. Co. v. McDuff*, 319 So. 2d 658, 660 (Miss. 1975); *see also Meena v. Wilburn*, 603 So. 2d 866, 872-73

6

(Miss. 1992) (rejecting contention that jury improperly returned verdict against doctor while exonerating nurse who carried out his instructions); *D.W. Boutwell Butane Co. v. Smith*, 244 So. 2d 11, 12-13 (Miss. 1971) (holding that jury's finding employer liable, but exonerating its truck driver for plaintiffs' injuries from collision with truck, is permissible under Mississippi law).

UN upholds the propriety of the exclusion of the exonerated employees' statements, because the court's construction of the verdict is the only "logical and probable" interpretation, and the jury *could* have based its defamation finding on *other* evidence. It asserts that the cited Mississippi cases are *not* applicable, because they did *not* involve special verdicts, while here, the jury *specifically* found the three co-defendants *did not defame Smith*. It maintains, furthermore, the Mississippi cases do *not* hold an employer may be held liable for an employee's actions *if* the jury finds such actions did *not* occur.

The court instructed the jury that, for Smith to succeed on his defamation claim, he had to prove:

> One, that an agent of [UN], including ... Ozbolt, ... McDonald, or ... Brown made false and defamatory statements concerning ... Smith to a third party.
>
> Two, the communication was not the subject of a privilege, on which you have been instructed separately.
>
> Third, that ... Ozbolt, ... McDonald, ... Brown, and/or [UN], through one or more of those individuals were negligent, ... reckless

7

or malicious in making the defamatory statements, without regard to whether the statements were true or false.

Fourth, ... Smith was injured or damaged as a result of the defamatory statements, and that such statements were the sole proximate cause or a proximate contributing cause of Smith's damages, if any. Under those circumstances, ... you *must find in favor of ... Smith and against [UN] and/or the agent or agents whom you find from a preponderance of the evidence made the defamatory statements*.

(Emphasis added.)

The jurors *could have been* misled by some of the language in the instruction, if taken in isolation. But, in the context of the entire instruction, as well as the instructions as a whole, the court's guidance was *not* misleading.

Concerning the Mississippi cases permitting employer liability despite employee exoneration, the case at hand is distinguishable, in the light of the jury's *specific finding* that the three co-defendants did *not* defame Smith. We agree with UN that, even under Mississippi's unusual precedent, it is essential for there to be a finding that the injury-causing action was by a co-defendant employee; "[o]therwise, the verdict could not be explained". *Capital Transp.*, 319 So. 2d at 661. Therefore, the court properly excluded the evidence relative to the three co-defendant employees.

2.

Pursuant to FED. R. CIV. P. 50(a)(1), the district court may grant a JMOL against a party who has *not* presented a "legally

8

sufficient evidentiary basis for a reasonable jury to find for that party" on an issue necessary to his claim.

Smith maintains that, *even without the co-defendant employees' statements*, there is a "legally sufficient evidentiary basis" for punitive damages. For our review of the JMOL granted UN, we utilize the standard applied by district court. All the evidence is viewed in the light most favorable to Smith; and, if "reasonable and fair-minded jurors" might disagree, the court should have denied UN's motion. *See* **London v. MAC Corp. of Am.,** 44 F.3d 316, 318 (5th Cir. 1995) (internal quotation marks and citation omitted). First, Smith contends that the 14 March 1995 letter from UN's Senior Vice-President McCullough to the Insurance Department contained defamatory statements about him. McCullough wrote that Smith

> has gone back into our houses, replaced our business with [LG] policies without regard to the contestable clause and has apparently taken advantage of many of the policyholders on his route. Having worked this area for over ten years, you could understand these policyholders have come to trust Mr. Smith and they will do what he asks them to do.... I don't know if the ... department can do anything about this, but I think you will agree what he is doing is totally unethical.

Smith points also to a 26 April 1995 letter from McCullough to the Department's chief investigator, stating that Smith had induced his former customers to send in "cash surrender values" on their UN policies. Smith claims this statement was false, and that there was *no* evidence at trial to support it. He asserts also that UN

attempted to ruin his reputation at LG, by falsely communicating to it that UN had problems with Smith's "audit" (reconciliation of his accounts), and that he was "replacing [UN's] business [with LG insurance]".

Smith contends further there was sufficient proof that UN agents, *other than the three exonerated co-defendants*, gathered defamatory written statements from policyholders, including: (1) one "retraction letter", in which a policyholder specifically mentioned Floyd as having drafted a statement (there were several letters in the record, in which policyholders stated they had been misled by UN agents and did *not* wish to cancel their LG insurance); (2) former UN agent Tinnerello's admission that he gathered statements; and (3) co-defendant Ozbolt's admission that he and other UN agents gathered and sent policyholder statements to UN's home office, which forwarded them to the Insurance Department.[2]

According to Smith, all of the written statements were defamatory *per se*, because they falsely accused him of practices incompatible with his trade or business, citing **Taylor v. Standard Oil Co.**, 186 So. 294, 295 (Miss. 1939), with damages and malicious

---

[2]In addition, one policyholder testified that a "representative", or "representatives" of UN (other than the three co-defendant employees), whom she did *not* identify, "would say things like, 'you know, Les [Smith] is in jail, he has been in jail over the weekend,' and, you know, things like that". But, as noted, Smith's focus is on written statements. In any event, this testimony, concerning an unidentified person, is *not* sufficient evidence of defamation, much less for punitive damages.

10

intent being presumed, citing, *e.g.*, **Brewer v. Memphis Publ'g Co.**, 626 F.2d 1238, 1245-46 (5th Cir. 1980), and **Natchez Times Publ'g Co. v. Dunigan**, 72 So. 2d 681, 684-85 (Miss. 1954). He contends the court ignored this presumption, and therefore erred in finding insufficient proof of malice.

Finally, Smith asserts that the jury reasonably could have concluded, especially from the Insurance Department's investigation file (which included the policyholders' requests for refunds from LG, their "retraction" letters, and McCullough's letters), that UN's employees' actions were caused by UN's intentional and malicious practice of obtaining false statements and delivering them to LG and the Insurance Department, in an effort to discredit him and cost him his livelihood.[3]

UN contends that punitive damages *cannot* stand on this "other" evidence alone. In this regard, it notes that: neither the McCullough letters nor the alleged statements to LG demonstrate malice justifying such damages; at a minimum, UN believed, in good faith, the statements were true; testimony regarding its statements to LG should *not* be considered, because UN's hearsay objection was sustained; and Smith failed to show Tinnerello and Floyd had malicious intent. It notes also the jury was instructed, pursuant to Smith's own instruction:

---

[3]As a result of UN's correspondence, the Department decided Smith was in violation of regulations requiring him having authorization to sell insurance for LG; it and Smith were fined.

11

Smith can recover punitive damages from [UN] for the actions of ... Ozbolt, ... McDonald, ... Brown or ... [non counter-defendant] Floyd, and from each individual Counter-Defendant only if he proves to you by a preponderance of the evidence as to those respective Counter-Defendants, that defamatory words were published by that particular Counter-Defendant, or its representative in the case of [UN], with *knowledge of the words being false or with reckless disregard for the truth or falsity of the words*.

The Court further instructs you that you may award punitive damages if ... Smith has proven by a preponderance of the evidence that the defamation of Smith, if any, by [UN] agents was *willfully or intentionally committed*. You may consider all events that occurred both individually and as a whole in making this decision.

(Emphasis added.)

We agree with the district court that, without the properly excluded evidence regarding the three exonerated co-defendant UN employees, the remaining evidence is insufficient to support punitive damages, as discussed *infra* regarding qualified privilege.

B.

By cross-appeal, UN claims the evidence fails to support defamation, because its communications to the Insurance Department were substantially true (and therefore *not* defamatory), and/or qualifiedly privileged.[4]  Because we find privilege, we need *not* address truthfulness *vel non*.

---

[4]As noted *supra*, the district court sustained UN's objection to the testimony regarding UN's alleged statements to LG.

12

Under Mississippi law, a communication, which might otherwise be defamatory, is qualifiedly privileged when it concerns a matter "'in which the person making it has an interest, or in reference to which he has a duty ... if made to a person or persons having a corresponding interest or duty'", as long as the statement "'is made without malice and in good faith'". *Garziano v. E.I. Du Pont De Nemours & Co.*, 818 F.2d 380, 385 (5th Cir. 1987) (quoting *Louisiana Oil Corp. v. Renno*, 157 So. 705, 708 (Miss. 1934)); *see also Burroughs v. FFP Operating Partners, L.P.*, 28 F.3d 543, 547 (5th Cir. 1994) (noting that "statements made by an employer against an employee, that affect the latter's employment", are so privileged) (citing *Benson v. Hall*, 339 So. 2d 570, 572 (Miss. 1976)).

Such a communication, if "limited to those persons who have a legitimate and direct interest in the subject matter", carries a "presumption of good faith". *Benson*, 339 So. 2d at 572 (citation omitted). Where qualified privilege may be relevant, Mississippi courts determine whether the privilege arose in the context of the communication, and, if so, whether the scope of the privilege was exceeded. *Garziano*, 818 F.2d at 386.

When the relevant facts are undisputed, the trial court must make the initial decision whether a qualified privilege applies: if it does apply, the court "should instruct the jury accordingly; if not the jury should be given a special interrogatory on this issue". *Id.* at 394. *If* the statements were made on an occasion of qualified

13

privilege, *then* "[a]ctual or express malice", demonstrating "a design to willfully or wantonly injure another", must be clearly proved to overcome the good faith presumption. **Hayden v. Foryt**, 407 So. 2d 535, 539 (Miss. 1982) (internal quotation marks and citation omitted). Malice is *not* implied, even where a statement could be considered defamatory *per se*; the one claiming to have been defamed must demonstrate "bad faith, actual malice, or abuse of the privilege through excess publication". **Garziano**, 818 F.2d at 388.

According to UN, the jury should have been instructed that UN's communications with the Department were qualifiedly privileged. At any rate, it maintains that: there was insufficient evidence to support finding it abused the privilege, citing **Goforth v. Avemco Life Ins. Co.**, 368 F.2d 25, 32 (4th Cir. 1966) (finding no inference of bad faith in complaint letters to insurance department); as the district court observed in its memorandum opinion, UN had a legitimate interest in protecting its business, and arguably had a duty to report what it perceived to be questionable conduct to the state agency charged with general oversight; and Smith did *not* present sufficient evidence of malice, bad faith, or excessive publication in connection with those letters, or the policyholder letters.

Smith claims sufficient evidence for UN *not* being entitled to a qualified privilege, and that UN waived any objection to the instruction on this issue by failing to object.

14

On qualified privilege, the court instructed:

> If you find that the alleged defamatory statements were made by [UN] and its agents and were made to persons who have an interest in knowing the information which was conveyed, then [UN] and its agents enjoy what is known as a qualified privilege. Where a qualified privilege exists, the statements, if made, are *presumed to be made in good faith*.... Smith then bears the burden of overcoming this presumption of good faith.... Smith may overcome this qualified privilege by establishing by a preponderance of the evidence that [UN] or its agents either published the defamatory statements *in bad faith or actual malice, or abused that privilege through excess publication, or where the scope of the statements exceeded what was necessary to protect the interests of [UN]*, ... then [UN] loses the qualified privilege even as to the individuals ... to whom it applied.

(Emphasis added).

This instruction is consistent with Mississippi law on qualified privilege. It acts "as a shield against defamation claims as a matter of public policy". *Garziano*, 818 F.2d at 385.

For the evidence relied on by Smith, we agree with the district court that McCullough's letters are the most significant evidence remaining in Smith's favor. This is because there is little evidence that agents, other than the exonerated co-defendants, drafted any defamatory statements subsequently sent to the Insurance Department, or induced policyholders to do so.

15

Utilizing Mississippi's two-part test, we find, first, as a matter of law, that McCullough's letters to the Department were qualifiedly privileged. (While such an instruction would have been proper, UN apparently did *not* object in district court to the given qualified privilege instruction.) For the test's second prong, there is insufficient evidence of the requisite malice or excess publication to overcome the privilege. *See **Tipps Tool Co. v. Hollifield***, 67 So. 2d 609, 618 (Miss. 1953).

While the court found that McCullough's letters did *not* evidence such malice, it concluded erroneously, perhaps in its effort to reconcile the verdict, that the letters could support compensatory damages. Because the evidence remaining after the court reconciled the verdict is legally insufficient for a reasonable jury to find for Smith, UN is entitled to a JMOL on his defamation claim. *See **Weisgram v. Marley Co.***, __ S. Ct. __, 2000 WL 196662, at *3 (22 Feb. 2000). (In the light of this holding, we need *not* address Smith's contentions regarding the district court's conditionally granting UN a new trial on punitive damages, and denying Smith attorney's fees.)

## C.

Smith contests the breach of contract JMOL, as well as the resulting damages and attorney's fees. (In his contract, Smith "agree[d] ... [to] reimburse [UN] for reasonable attorneys' fees and costs incurred by [UN] in enforcing this covenant not to compete".)

16

He maintains neither enforceability of the non-compete covenant nor proximate cause of damages was proved.

1.

Whether a covenant not to compete is valid and enforceable "is largely predicated upon the reasonableness and specificity of its terms, primarily, the duration of the restriction and its geographic scope"; and "[t]he burden of proving the reasonableness of these terms is on the employer". *Empiregas, Inc. v. Bain*, 599 So. 2d 971, 975 (Miss. 1992) (citations omitted). We must also examine the covenant's effect on "the rights of the employer, the rights of the employee, and the rights of the public", and balance these respective interests. *Texas Rd. Boring Co. v. Parker*, 194 So. 2d 885, 888 (Miss. 1967).

Mississippi courts recognize an employer has a right to protect itself "from loss of customers by the activities of the former employees who have peculiar knowledge of and relationships with the employer's customers". *Redd Pest Control Co. v. Heatherly*, 157 So. 2d 133, 136 (Miss. 1963). On the other hand, the ex-employer must overcome a presumption against such restraints by showing that it is economically justified. *Thames v. Davis & Goulet Ins., Inc.*, 420 So. 2d 1041, 1043 (Miss. 1982).

Smith contends that, because UN only presented evidence that the covenant existed and that he competed with UN after he left its employ, UN failed to prove the economic justification or

17

reasonableness, rendering the covenant unenforceable as a matter of law.

UN counters that it produced ample evidence concerning scope and duration reasonableness, and economic justification. Regarding its interest, UN asserts it proved Smith was "the vital link between [UN] and its policyholders" in Debit 15, and this relationship was a protectable economic interest sufficient to justify enforcement of a narrowly tailored non-compete. It points to the testimony of Smith's own witnesses that they were fond of, and trusted, him, and that they subsequently bought LG, and later Texas Life, insurance from him. As to Smith's interest, UN contends the evidence shows that he would *not* be unreasonably burdened by the covenant's enforcement, as evidenced by Ozbolt's testimony that, under the covenant's terms, Smith would *only* be restricted from soliciting in Debit 15 (a smaller area than the 15 counties listed in the contract), and *only* for one year, and its implication that Smith would *not* be prohibited from soliciting new customers elsewhere in Mississippi. Finally, UN asserts that enforcement would *not* disserve the public, because the evidence established that Smith often represented multiple companies, demonstrating that "competition in the life insurance industry abounds".

After concluding, as a matter of law, there was "no question" Smith breached his contract, the district court held reasonable the covenant's geographic and time limits. As UN admits, the covenant

18

would *only* prohibit Smith from competing in Debit 15.  Therefore, we agree that it made the requisite showing for enforceability.

Concomitantly, in the light of this ruling, we reject Smith's contention that UN is *not* entitled to attorney's fees, as allowed by his contract.  (Smith does *not* challenge the amount awarded, *only* failure to prove entitlement.)

2.

Smith asserts also that UN failed to prove its damages were proximately caused by his breach.  (Again, he does *not* challenge the amount awarded.)  He maintains that, instead, UN relied *only* on its assumption that, if a UN policy lapsed, it was due to Smith's conduct; and that it did *not* provide a sufficient basis for its lost profits calculation.  He contends that UN's calculations rested solely on a list, compiled by UN's attorney, of names of former UN policyholders, which "matched" with names on LG's policyholder list; and that, based on it, a UN employee created a computer-generated "lost policy" list, used by UN's damages expert to calculate damages.  Smith maintains that:  neither list-maker visited Debit 15 to verify why the policies lapsed; the testimony established they may have lapsed for a number of reasons; and many lapsed prior to his leaving UN or after expiration of the one-year limitation. Noting that there is "nothing wrong" with policyholders owning multiple policies, he asserts further that the fact that he sold many of the LG policies on the list, by itself, is insufficient to

19

prove he caused the lapses.

UN notes that, per Smith's own jury instruction, it had *only* to demonstrate his breach was the "reasonably probable" cause of its injuries, and that, of course, "mathematical precision" was *not* required.  It asserts it did prove the cause of its damages: namely, that Smith contacted UN policyholders to sell them LG insurance, in violation of his covenant; at least 285 UN policyholders in Smith's former service area appeared on LG's policyholder list or on one of its policy applications; and many of Smith's witnesses testified that they bought a LG policy from him.  Additionally, UN contends that its damages expert made adjustments for UN's "historical lapse and mortality experience" in calculating UN's damages, and "utiliz[ed] a profitability analysis used in the ordinary course of [UN's] business to price new products and determine profitability of old products".

Under Mississippi law, "reasonable certainty" is the standard of proof for recovering profits lost from a breach of contract; while "[t]here are no guidelines set in stone specifying the degree of certainty", and the necessary proof "usually depends on the particular facts of the case", the calculation must be based, of course, on more than "speculation or conjecture".  ***Lovett v. E.L. Garner, Inc.***, 511 So. 2d 1346, 1353 (Miss. 1987) (internal quotation marks and citation omitted); *see also* ***Ammons v. Wilson & Co.***, 170 So. 227, 229 (Miss. 1936) (stating that damages must be "trace[d]

... directly to the breach of the contract").

Of course, the burden of proof lies with the party seeking damages. The proof will be sufficient if it provides "a reasonable basis for [its] computation and the best evidence which is obtainable under the circumstances", to allow the factfinder "to arrive at a fair approximate estimate of [the] loss". *City of New Albany v. Barkley*, 510 So. 2d 805, 808 (Miss. 1987) (internal quotation marks and citation omitted).

UN did *not* unequivocally link each of its lapsed policies to Smith's breach; but, Mississippi law does *not* require that. Instead, UN, to a "reasonable certainty", presented evidence sufficient for the jury to find Smith's conduct caused its loss.

## III.

For the foregoing reasons, those parts of the judgment concerning punitive damages, UN's contract claim, and its damages and attorney's fees and expenses are **AFFIRMED**; those parts as to Smith's defamation claim and corresponding compensatory damages are **REVERSED** and judgment is **RENDERED** for UN on those matters.

*AFFIRMED IN PART; REVERSED AND RENDERED IN PART*

21