659 So.2d 574 (1995)
Matthew BULLOCK, Individually and as Father and Next Friend of Gary Brooks, Matthew Brooks, Jonas Brooks, and Phillip Michael Bullock, Minors
v.
Ricardo THOMAS, a Minor; The Heirs at Law of Mario Thomas, Deceased; and Illinois Central Railroad.
No. 92-CA-00466-SCT.
Supreme Court of Mississippi.
August 3, 1995.
James C. Patton, Jr., Crawley & Ford, Louisville, for appellant.
George H. Ritter, John W. Robinson, III, Wise Carter Child & Caraway, Jackson, Robert M. Jones, Jackson, for appellee.
Before HAWKINS, C.J., and SULLIVAN and McRAE, JJ.
*575 SULLIVAN, Justice, for the Court:
Matthew Bullock and Linda Thomas (Linda) began a relationship in 1986 even though Bullock lived with Brenda Brooks during this time. Linda was living with her son Ricardo Thomas (Ricardo) and her daughter Kinshata Thomas (Kinshata) in Canton, Mississippi. Bullock and Linda began having sexual intercourse about three or four months into the relationship. Mario Thomas (Mario) was conceived during this time which was around October, 1987. Mario was born on July 31, 1988 at University Hospital in Jackson, Mississippi.
Mario, Linda, and Kinshata were killed on May 9, 1991 when their automobile was struck by a southbound Amtrak passenger train at the Way Road crossing in Canton, Mississippi. Mario was a minor resident of Madison County, Mississippi. Linda, Mario's mother, was driving the automobile at the time of the accident. Mario's brother, Ricardo, escaped before the collision took place.
Matthew Bullock, individually, and as next friend of Ricardo Thomas, instituted a wrongful death action under Miss. Code Ann. § 11-7-13 (1972) against the Illinois Central Railroad Company and Cecil V. Coker. Bullock alleged he was Mario's natural father, legal heir and statutory wrongful death beneficiary under Miss. Code Ann. § 11-7-13 (1972).
Bullock, however, had not established himself as a wrongful death beneficiary of Mario pursuant to § 11-7-13 because he had not established his right to inherit from Mario under § 91-1-15. Therefore, Bullock, individually, and as father and next friend of Gary Brooks, Matthew Brooks, Jonas Brooks and Phillip Michael Bullock, minors, filed a Petition for Determination of Paternity and to Establish Heirship against Ricardo Thomas, a minor, and the heirs at law of Mario Thomas. In the petition, Bullock alleged he was Mario's natural father, and as such, an heir at law. Consequently, Bullock alleged that his and Brenda Brooks' children (Gary, Matthew, Jonas and Phillip) were the half-blood kindred of Mario. Bullock sought the chancellor's determination that he was Mario's natural thereby father establishing paternity and heirship pursuant to Miss. Code Ann. § 91-1-15(3)(c) and (d)(i).
The chancellor permitted Illinois Central Railroad Company (ICR) to intervene on December 2, 1991. ICR filed an answer in which, among other things, it denied that Bullock was the natural father and/or legal heir of Mario. The court determined that Bullock had established himself as Mario's father, but found that Bullock had failed to prove he had openly treated Mario as his child. The Court also found he had neglected to support Mario pursuant to the mandate of § 91-1-15 in order for Bullock to be considered Mario's wrongful death beneficiary under § 11-7-13.
Bullock contends on appeal that the trial court erred in finding that he and the minor appellants, Gary Brooks, Matthew Brooks, Jonas Brooks and Phillip Michael Bullock failed to establish their right to inherit from Mario Thomas, deceased, pursuant to Miss. Code Ann. § 91-1-15 (1972).
Ricardo Thomas and the heirs at law of Mario Thomas cross-appeal claiming that the chancellor erred in the finding that Matthew Bullock proved by clear and convincing evidence that he was the natural father of Mario Thomas.
Before Bullock or his children may inherit through Mario, a deceased illegitimate child, Bullock must establish himself as the natural father and legal heir of Mario. Miss. Code Ann. § 91-1-15(3) (1972) provides in pertinent part:
(3) [T]he natural father of an illegitimate and his kindred shall inherit from and through the illegitimate according to the statutes of descent and distribution if:
(a) The natural parents participated in a marriage ceremony before the birth of the child... .
(b) There has been an adjudication of paternity or legitimacy before the death of the intestate; or
(c) There has been an adjudication of paternity after the death of the intestate, based upon clear and convincing evidence, in an heirship proceeding under sections 91-1-27 and 91-1-29.

*576 (d) The natural father of an illegitimate and his kindred shall not inherit:
(i) From or through the child unless the father has openly treated the child as his, and has not refused or neglected to support the child.
(Emphasis added). Bullock and Linda were never married, nor was there an adjudication of paternity or legitimacy before Mario's death. Thus, subsections (c) and (d) are applicable here. Subsection (c) is the relevant portion of the statute on cross-appeal  i.e., whether the chancellor erred in determining Bullock had established paternity by clear and convincing evidence. The cross-appeal will be addressed first.
Miss. Code Ann. § 91-1-15(3)(c) (1972) states that in order for a putative father to inherit through an illegitimate, he must prove he is the natural father by clear and convincing evidence. In Estate of Robinson v. Gusta, 540 So.2d 30 (Miss. 1989), this Court found the evidence that the mother and putative father engaged in sexual intercourse nine months prior to the birth of the alleged natural son of the father, coupled with the fact that there was no evidence the mother had engaged in sexual intercourse with another man during that time frame, plus "any number of implied acknowledgments by Robinson of the fact of paternity, such as his income tax returns and his food stamp applications," sufficed to withstand the clear and convincing evidence standard of establishing paternity. The chancellor found the following in this case:
Although the evidence was conflicting on the issue of paternity, I am of the opinion that Matthew met his burden in this regard and established himself as the father of Mario. I will not attempt to detail the evidence leading to this conclusion. However, I will say that statements made by Linda to her relatives and to the Department of Human Services to the effect that Matthew was Mario's child weighed heavily in favor of the paternity decision. Also, for the benefit of the record, I must state that there was a definite resemblance between the face of Mario as it appeared on a photograph to the countenance of Matthew in the courtroom.
It was wholly uncontradicted that Linda engaged in sexual relations exclusively with Bullock at the time Mario was conceived. Moreover, several witnesses, including members of Linda's family, testified that Mario greatly resembled Bullock. Linda openly claimed to her relatives that Bullock was the natural father of Mario. She also listed him as the father on her DHS assistance application. While the named putative father on a DHS application was not always reliable, it is further support for the chancellor's finding. The chancellor also made his determination after comparing the child's photograph with Bullock's physical appearance. Thus, the chancellor's finding that Bullock proved he was the natural father by clear and convincing evidence is supported by the record. The cross-appeal is without merit.
Miss. Code Ann. § 91-1-15(3)(d) (1972) is the section dealing with Bullock's assignment of error on appeal. Bullock claims that the chancellor erred in determining that (1) Bullock failed to establish that he openly treated Mario as his, and (2) Bullock failed to establish he had not refused or neglected to support Mario. It should be noted that the statute plainly says that Bullock may not inherit from Mario unless he satisfies both requirements  that he openly treated Mario as his and did not refuse or neglect to support Mario.
This Court, in ruling on a chancellor's determination on the issue of whether a father has openly treated an illegitimate child as his own "may only be treated as a finding of fact...." Matter of Estate of Ford, 552 So.2d 1065, 1068 (Miss. 1989). This finding will only be reversed if manifestly erroneous or unsupported by substantial evidence in the record. Id., citing Leard v. Breland, 514 So.2d 778, 781 (Miss. 1987); Lovett v. E.L. Garner, Inc., 511 So.2d 1346, 1349 (Miss. 1987). The chancellor in this case found that Bullock had not openly treated Mario as his child. The chancellor's opinion states the following with regard to whether Bullock openly treated Mario as his child:
Frankly I am not convinced from the evidence that Matthew openly treated Mario as his child, albeit he undoubtedly on occasions acknowledged the child to be *577 his. In my mind, to acknowledge a child from time to time as one's own and to openly treat a child as one's own are not synonymous. I do not doubt the testimony to the effect that Matthew would on occasions take Mario with him and would among certain family members acknowledge him to be his son. However, I do not believe that his time spent with Mario, and for the benefit of the child, was as great as Matthew attempted to establish. The proof shows that most of the time, if not all, when Matthew was with Mario, he was also in the company of Linda and her other children. In other words, the proof does not establish in my mind that Matthew did things alone with Mario based upon any father/son relationship. Frankly, I would surmise that his presence with the child was attributable more to his wanting to be near the child's mother than to Mario himself. Weighing heavily in my conclusion that Matthew did not openly treat Mario as his child is the fact that he waited a year to tell Brenda of Mario's existence. I do not recall any evidence to the effect that he ever told his other children about Mario being their brother. Certainly, there was no evidence that Matthew ever had Mario visit with his other children in his home or elsewhere. Matthew was not present for the birth of Mario, although he admits that he knew that Linda had gone to the hospital to deliver the child. Furthermore, he did not attend the funeral of Mario, albeit he claims to have been outside the church. He did not tell Brenda that he planned to attend Mario's funeral (or be in the vicinity thereof), nor did he speak to any family members during the burial service. The evidence fails to show that Matthew made any arrangements for his children, whom he now claims to be brothers of Mario, to attend Mario's funeral.
Based on the facts elicited in the paternity hearing, the chancellor's findings with regard to this issue were neither manifestly erroneous nor unsupported by the evidence contained in this record. Mario was born on July 31, 1988, but Bullock did not see the child until two days after Linda and the child had returned from the hospital. Bullock said that he tried to get to the hospital when Linda was there for two days delivering Mario, but explained that he did not make it there in time. This explanation was questionable because Bullock possessed a car and was unemployed at the time. Brenda Brooks, Bullock's claimed common law wife, did not find out about Mario for approximately one year after his birth. Bullock attempted to explain away the fact that Brenda did not learn about the child for at least one year by claiming that "it should certainly be understandable in light of his relationship with Ms. Brooks." However, hiding the fact that you have a child from your supposed common law wife is directly contrary to openly treating the child as your own.
Openly treating a child as one's own encompasses more than showing up at the mother's house on occasion to take the mother and the child sightseeing and shopping. The chancellor's determination that Bullock's time with the child was attributable to his desire to be with Linda, more so than his desire to be with Mario himself, was consistent with the fact that Linda was almost always present during the times that Mario and Bullock saw one another. Bullock produced no evidence of a father/son relationship other than the fact that he occasionally took Linda and Mario to lunch or to the zoo. Bullock did not visit Mario on either of his first two birthdays. Furthermore, no evidence was presented showing that Bullock took Mario home to visit with his other children, supposedly Mario's half-brothers.
Finally, the chancellor properly considered the fact that Bullock did not attend Mario's funeral in finding that he did not openly treat Mario as his own. Bullock did not go to Mario's burial either, although he claimed to have been outside the church during the funeral. At most, he gave $100.00 to Linda's aunt to buy Mario a suit in which to be buried. In light of all the facts, this Court finds that the chancellor's conclusion that Bullock failed to openly treat Mario as his own was supported by credible evidence.
The next question is whether the chancellor was wrong in determining that *578 Bullock failed to establish the negative  that he did not refuse or neglect to support Mario. This Court has said that "refusing or neglecting to support a child is qualitatively different from mere failure to support and this is no doubt the reason for the legislative language." Matter of Estate of Ford, 552 So.2d at 1068, citing Department of Welfare of City of New York v. Siebel, 6 N.Y.2d 536, 546, 190 N.Y.S.2d 683, 691, 161 N.E.2d 1, 7 (1959). Again, the chancellor's findings of fact should not be overruled unless manifestly erroneous or unsupported by the record. Id.
The chancellor found that Bullock failed to satisfy this portion of the statute even though "some support trickled down to Mario by virtue of Matthew's relationship with his mother." Although the chancellor stated that "the proof establishes that his contributions were spasmodic and appeared to be more of a gratuity than the fulfillment of a legal obligation," the chancellor concluded that Bullock did present evidence that he made financial contributions for the benefit of Mario. There is no question that Bullock could have done more for Mario, but the statute does not necessarily require more than Bullock showed.
It was uncontradicted that Bullock received only $480.00 a month in the form of a disability check. Further, Bullock stated that he provided Linda money when she needed it for Mario, and that he averaged giving her $100.00 a month. Jerry Dean, Linda's sister, corroborated this testimony to some degree by stating that she was with Bullock and Linda when Bullock cashed his check and gave Linda some money. Bullock bought Mario his first pair of shoes and a kerosene heater for his use. This was enough to show that Bullock did not refuse or neglect to support Mario. This portion of the chancellor's opinion was manifestly erroneous.
The chancellor's ruling should not be overruled on the overall determination that Bullock failed to satisfy the requirements for the right to inherit from an illegitimate child under § 91-1-15(3)(d)(I). Bullock had to show two things to prevail  (1) that he openly treated Mario as his own, and (2) that he did not refuse or neglect to support Mario. Because the chancellor was correct in his finding that Bullock failed to meet the first requirement, Bullock and his children were properly denied the right to inherit through Mario.
AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and PITTMAN, BANKS, McRAE, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.