# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-00524-SCT

*IN THE MATTER OF THE ESTATE OF JAQUARIUS QUADRION PATTERSON, DECEASED: DANA L. STANTON, GUARDIAN OF THE ESTATE OF DA'SHUN NENEH' KEITH McMILLIAN AND DASHUN N. McMILLIAN*

*v.*

*JOHN W. PATTERSON, JR., ADMINISTRATOR OF THE ESTATE OF JAQUARIUS QUADRION PATTERSON, DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/27/1999 |
| TRIAL JUDGE: | HON. W. HOLLIS McGEHEE, II |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | J. ELMO LANG |
| ATTORNEYS FOR APPELLEE: | JAMES W. NOBLES, JR. |
| | TRAVIS T. VANCE, JR. |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 01/25/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 2/15/2001 |

**BEFORE PITTMAN, C.J., WALLER AND COBB, JJ.**

**COBB, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. This is an appeal from a judgment of the Chancery Court of Pike County finding that the wrongful death beneficiary of three-year-old Jaquarius Patterson was the estate of his deceased mother, Quivoria Patterson.

¶2. Jaquarius's natural father, Juan McMillian, had never married Quivoria, never acknowledged that Jaquarius was his son, never provided support, nor had any contact with him. Pursuant to Miss. Code Ann. § 91-1-15(3)(d)(i) (1994) in conjunction with Miss. Code Ann. § 11-7-13 (Supp. 2000), the chancellor found that Juan McMillian was not an heir at law nor a wrongful death beneficiary of Jaquarius.

¶3. Dana L. Stanton, natural mother and Guardian of Da'Shun Neneh' Keith McMillian,[(1)] aggrieved of the decision, has filed this appeal,[(2)] raising the following issues:

> **I. WHEN THE FATHER WAS NOT AWARE THAT HE WAS THE FATHER OF THE CHILD UNTIL FOUR (4) DAYS PRIOR TO THE CHILD'S DEATH, CAN HE BE HELD ACCOUNTABLE FOR NOT SUPPORTING THE CHILD OR TREATING THE CHILD**

**AS HIS AS PROVIDED UNDER MS. CODE SECTION 91-1-15 (3)(D)(i)?**

**II. UNDER THE WRONGFUL DEATH STATUTE 11-7-13, DOES AN ILLEGITIMATE HALF BROTHER HAVE THE RIGHT TO INHERIT FROM HIS HALF BROTHER?**

¶4. For the reasons stated below, the judgment of the chancery court is affirmed.

## STATEMENT OF THE FACTS

¶5. Jaquarius Patterson was born to Juan McMillian and Quivoria Patterson in 1995. Quivoria and Jaquarius were killed in 1998 in an automobile accident.

¶6. It is uncontroverted that Juan and Quivoria had an affair lasting approximately four months while the two were students at Alcorn State University. When she became pregnant and told Juan the child was his, he told her that he did not think he was the child's father, but that a blood test would show whether he was, and that "when the blood tests came back" that they would "talk then."

¶7. At trial, Juan testified to the following facts which substantiated his total absence from the life of his son Jaquarius. He did not know when Jaquarius was born because he had not communicated with Quivoria after she told him she was pregnant. Juan never met Jaquarius. He had only seen a photograph of him that Quivoria sent in a Christmas card approximately a year before Jaquarius's death. Juan never responded to the Christmas card. Juan provided Quivoria no support for Jaquarius's birth or medical expenses, food, or clothing. Juan sent no birthday cards or presents. He sent no Christmas gifts. He paid nothing toward Jaquarius's funeral bill. He had not contacted Quivoria or Jaquarius before their deaths, and he never acknowledged the child as his during Jaquarius's lifetime. Following a blood test ordered in a Pike County DHS case[3] Juan McMillian received confirmation only four days before Jaquarius's death that he was his father.

## DISCUSSION

**I. WHEN THE FATHER WAS NOT AWARE THAT HE WAS THE FATHER OF THE CHILD UNTIL FOUR (4) DAYS PRIOR TO THE CHILD'S DEATH, CAN HE BE HELD ACCOUNTABLE FOR NOT SUPPORTING THE CHILD OR TREATING THE CHILD AS HIS AS PROVIDED UNDER MS. CODE SECTION 91-1-15 (3)(d)(i)?**

¶8. In *Bullock v. Thomas*, 659 So. 2d 574, 576 (Miss. 1995) this Court stated:

This Court, in ruling on a chancellor's determination on the issue of whether a father has openly treated an illegitimate child as his own "may only be treated as a finding of fact. . . . "*Matter of Estate of Ford,* 552 So. 2d 1065, 1068 (Miss. 1989). This finding will only be reversed if manifestly erroneous or unsupported by substantial evidence in the record. *Id.*, *citing Leard v. Breland,* 514 So.2d 778, 781 (Miss. 1987); *Lovett v. E.L. Garner, Inc.,* 511 So. 2d 1346, 1349 (Miss. 1987). . . .

*See also Draper v. Draper,* 658 So. 2d 866, 868-69 (Miss. 1995)(A chancellor's findings must be sustained, absent a finding of manifest error or abuse of discretion).

¶9. Miss. Code Ann. § 11-7-13 (Supp. 2000) clearly provides for inheritance from illegitimates, but the

right is tied to Miss. Code Ann. § 91-1-15(3)(d)(i) (1994). The applicable portion of § 11-7-13 reads:

> The provisions of this section shall apply to illegitimate children on account of the death of the natural father and to the natural father on account of the death of the illegitimate child or children, and they shall have all the benefits, rights and remedies conferred by this section on legitimates, **if the survivor has or establishes the right to inherit from the deceased under Section 91-1-15.**

Miss. Code Ann. § 11-7-13 (Supp. 2000)(emphasis added).

¶10. Miss. Code Ann. § 91-1-15(3)(d)(i) (1994) is stated in the negative and sets forth two distinct requirements. The statute provides in pertinent part: "The natural father of an illegitimate **and his kindred** shall not inherit: (i) From or through the child **unless** the father has openly treated the child as his, **and** has **not** refused or neglected to support the child." *Id.* (emphasis added).

¶11. In arguing that this section does not apply, Stanton asks this Court to simultaneously (1) acknowledge Juan's freedom to "choose to wait and see", and (2) overlook the fact that by exercising this freedom Juan knowingly and willingly forfeited any benefit, or burden, arising from openly treating Jaquarius as his own and supporting him during his lifetime. Juan cannot have it both ways. Juan was free to choose to "wait and see," and he did just that. But he also made another choice. Upon receiving the test results proving that he was the father of Jaquarius, who was then almost three years old, Juan continued to refuse to acknowledge his paternity. He did not contact Quivoria to "talk then" about it.

¶12. We need not dissect the word "then", nor guess at Juan's intentions. We need not speculate as to how long it would have taken Juan to get around to acknowledging that he was Jaquarius's father and providing him support. No case or statute sets forth a definitive number of days, post-paternity testing results, within which a father must acknowledge an illegitimate child for purposes of taking as an heir. Case law, however, does address the meaning of "openly treating a child as one's own" and makes it crystal clear that this requirement and the requirement of support must both be met.

¶13. In the factually similar case of ***Bullock v. Thomas***, 659 So. 2d 574 (Miss. 1995), this Court affirmed a chancellor's decision that a father and his children were not statutory heirs of his illegitimate son. There, as in the instant case, the son, almost three years old at the time, and the child's mother were killed in an automobile accident. The chancellor correctly determined that Bullock had failed to meet the requirements of § 91-1-15(3)(d)(i) in that he had not openly treated as his own and had failed to support his illegitimate child, Mario. This Court affirmed the portion of the chancellor's opinion that Bullock did not openly treat the child as his own. Concerning the fact that Bullock knew that Mario's mother had gone to the hospital to deliver the child, this Court noted that, "Mario was born on July 31, 1988, but Bullock did not see the child until two days after Linda and the child had returned from the hospital." *Id.* at 577 (emphasis added). Furthermore, he did not tell his common law wife about Mario until a year after his birth. Bullock occasionally took Linda and Mario to the zoo or to lunch, but did not visit Mario on either of his birthdays. In that case, Justice Sullivan, writing for the Court, even distinguished "acknowledging a child from time to time as one's own" from "openly treating a child as one's own." He reasoned that, "[o]penly treating a child as one's own encompasses more than showing up a the mother's house on occasion to take the mother and the child sightseeing and shopping." *Id.*

¶14. In contrast, here Juan did not know Quivoria had gone to the hospital, nor when the baby was born. He did not go to see mother and baby two days, two months or even two years after he was born. Indeed, he had never seen his son. Juan never once even "acknowledged" Jaquarius as his child. Juan's relationship with Jaquarius did not approach that of Bullock; Juan chose no relationship at all.

¶15. In another case on point, *Alexander v. Alexander*, 465 So. 2d 340, 341 (Miss. 1985), this Court also affirmed the chancellor's judgment denying a father heirship, finding that even though he had established that he was the natural father of the deceased child, he had not proven that he had supported the child.

¶16. The burden of proof in this case required Juan McMillian and Da' Shun McMillian, through his mother, Dana Stanton, to prove by clear and convincing evidence not only that Juan was the biological father of Jaquarius, but also that he was entitled to inherit from Jaquarius as heir-at-law and as a wrongful death beneficiary. The uncontradicted proof fails to support the claim that Da' Shun is an heir-at-law of Jaquarius through their common father, Juan. Therefore, we find Issue I to be without merit.

## II. UNDER THE WRONGFUL DEATH STATUTE 11-7-13, DOES AN ILLEGITIMATE HALF BROTHER HAVE THE RIGHT TO INHERIT FROM HIS HALF BROTHER?

¶17. The wrongful death statute provides for illegitimates to inherit, but that right is tied to Miss. Code Ann. § 91-1-15. Stanton asserts that § 91-1-15 (3)(d)(i) is unconstitutional under the equal protection clause of the Fourteenth Amendment as it pertains to Da' Shun. However, Stanton did not raise the constitutional issue in the court below. Further, she did not give the required notice of this issue to the State Attorney General in either the trial court or here. See M.R.C.P. 24(d); M.R.A.P. 44. Therefore, we decline to address this issue. *See Pickens v. Donaldson*, 748 So.2d 684, 691 (Miss.1999)

## CONCLUSION

¶18. The chancellor correctly applied the law to the undisputed facts. This case is a classic example of conduct the statutes and case law seek to prevent. A father should not be allowed to receive a windfall simply because he impregnated the child's mother. Juan McMillian refused to openly treat his son, Jaquarius, as his own or to comply with his duty to provide essential support, until it appeared he might receive a sizable inheritance. The judgment of the chancery court is affirmed.

¶19. **AFFIRMED.**

**PITTMAN, C.J., BANKS, P.J., SMITH, MILLS, WALLER AND DIAZ, JJ., CONCUR. McRAE, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION. EASLEY, J., NOT PARTICIPATING.**

**McRAE, PRESIDING JUSTICE, SPECIALLY CONCURRING**:

¶20. I concur with the majority in result only, as the constitutional issue of equal protection under this statute has not been properly raised before this Court. Mississippi's illegitimate children statute, Miss. Code Ann. § 91-1-15 (1994), creates a hierarchy of rights with respect to the natural mother, the child, and the natural father.

¶21. Under this statute, if a child dies the mother has to do nothing to inherit from the child. If the father dies, the child must show paternity or that the parents participated in a wedding ceremony before becoming

eligible to inherit from the father. A father, however, is required by this statute to prove that "he has openly treated the child as his" to be eligible to inherit from the child. This places an onerous burden on the father, who may or may not know that he is the father, and flies in the face of the constitutional guarantee of equal protection of the laws. For these reasons, the illegitimate children statute, Miss. Code Ann. § 91-1-15 (1994), is constitutionally flawed. As this issue is not properly before us, I specially concur in the result only.

¶22. Mississippi's wrongful death statute, Miss. Code Ann. § 11-7-13 (Supp. 2000), provides that illegitimate children and their mothers "shall have all of the benefits, rights, and remedies conferred by this section on legitimates." However, when it comes to illegitimates and their natural fathers, the statute imposes the requirement that the survivor meet the dictates of Miss. Code Ann. § 91-1-15 (1994) before becoming eligible to inherit.

¶23. Section 91-1-15(2) grants an unqualified right of inheritance between illegitimate children and their natural mothers. The statute requires no adjudication of paternity or of legitimacy. It sets no standards for the parent-child relationship as a requisite to inheritance, such as openly treating the child as her own and providing support for the child.

¶24. The statute further provides that an illegitimate child may establish a right to inherit from his deceased natural father if: 1) his natural parents participated in a wedding ceremony before his birth, even if it was subsequently adjudicated invalid, or, 2) if paternity or legitimacy has been adjudicated prior to the death of the intestate, or, 3) if paternity or legitimacy has been adjudicated after the death of the intestate in an heirship proceeding. Miss. Code Ann. § 91-1-15 (3)(a)-(c) (1994).

¶25. However, the statute requires the father of an illegitimate child to meet a higher burden before he is eligible to inherit from the child. "The natural father of an illegitimate and his kindred shall not inherit from or through the child unless the father has openly treated the child as his, and has not refused or neglected to support the child." Miss. Code Ann. § 91-1-15(3)(d)(i) (1994). This provision allows for a situation where an illegitimate child would be eligible to inherit from his natural father, while the natural father could not inherit from his illegitimate child. Such are the facts at bar.

¶26. The law does not require a child to show that he has openly treated his father as such or displayed affection, etc., as a predicate to inheritance. Presumably, this is because instances of illegitimate children abandoning their natural fathers is not a problem sought to be remedied by these statutes. On the other hand, encouraging fathers to "legitimize" their children is a practice that the state does and should encourage, although it should not be done at the expense of our constitutional protections.

¶27. However noble or morally correct the motive, where one citizen is denied a right enjoyed by others under similar circumstances, equal protection is denied. As this issue is not before us, I specially concur in the result only.

1. The six-year-old son of Juan McMillian as reflected in guardianship file 98-2461-WM in Jackson County Chancery Court.

2. Juan McMillian did not file an appeal.

3. A paternity case filed in July, 1997, in Pike County Chancery Court, No. 97-0521, to which Juan filed a waiver of service of process and entry of appearance on August 13, 1997.