# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01262-COA

IN THE MATTER OF THE ESTATE OF                   APPELLANT
DESHUNDRA S. TATE, DECEASED:
KENYATTA C. GARFIELD, NATURAL
FATHER OF KENDRA N. TATE, DECEASED

v.

BRENDA TATE                                               APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/18/2023 |
| TRIAL JUDGE: | HON. CATHERINE FARRIS-CARTER |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | PHILIP CAREY HEARN CHARLES CASSIDY COLE |
| ATTORNEY FOR APPELLEE: | CARLOS EUGENE MOORE |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 01/14/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., LAWRENCE AND EMFINGER, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1. Deshundra Tate and her five-year-old daughter Kendra Tate passed away due to a gas leak at their apartment located at Sunset Village Apartments in Cleveland, Mississippi. Kendra's father, Kenyatta Garfield, filed a wrongful death lawsuit against Sunset Village and became the administrator of Deshundra's Estate.[1] Deshundra's mother, Brenda Tate, moved

---

[1] A companion case was filed in the Bolivar County Chancery Court (Cause No. 2022-0237) on the same date, September 6, 2022. This other case involves the death of Kendra, who lost her life as a result of the same tragic accident. We discuss the issue of Kenyatta's heirship to Kendra in the current case because Brenda Tate raised the issue of heirship in the current case rather than the companion case.

for the chancery court to set aside the order that named Kenyatta the administrator. The court then ordered Brenda to be the administratrix of Deshundra's Estate. Brenda also petitioned for the determination of heirship and sought for Kenyatta to be disinherited from Kendra pursuant to Mississippi Code Annotated section 91-1-15(3)(d)(i) (Rev. 2008). The chancery court held a hearing and found that Kenyatta should be disinherited from his daughter, Kendra. This appeal followed. After review, we affirm the chancery court's order that Kenyatta shall not inherit from Kendra.

## FACTUAL BACKGROUND

¶2. Kenyatta and Deshundra were in a relationship but never married. On July 23, 2017, Deshundra gave birth to Kendra Tate. Kenyatta required DNA test results to establish paternity. The results found that Kenyatta was Kendra's father. On August 30, 2022, Deshundra and Kendra died as a result of a "gas leak" at their Sunset Village apartment in Cleveland, Mississippi. Shortly after Kendra's death, Kenyatta filed a wrongful death lawsuit against Sunset Village Apartments and petitioned the Bolivar County Chancery Court to open the Estate of Deshundra S. Tate and to appoint him as the administrator. On September 16, 2022, the chancery court entered an order to open the estate and appointed Kenyatta as the administrator. As a result of Kenyatta's appointment, Deshundra's mother, Brenda Tate, responded in opposition to the court's appointment, and she filed a motion to set aside Kenyatta's appointment as administrator. In her motion, Brenda argued that the court should disinherit Kenyatta pursuant to section 91-1-15(3)(d). On November 17, 2022, the court granted Brenda's motion to set aside, removing Kenyatta as administrator and appointing

2

Brenda as the administratrix. On December 19, 2022, the chancery court conducted a hearing to determine whether Kenyatta openly treated Kendra as his and whether he has not refused or neglected to support the child. A finding that he did not openly treat Kendra as his and refused or neglected to support the child means that he is not entitled to inherit.

¶3.     At the hearing, Deshundra's aunt Angela Tate was called to testify. She testified that "Deshundra was more like a child to [her] and [her] other sisters."[2] Angela testified that she would help them "[f]inacially, mentally, [and] emotionally." Angela was "very present" during the duration of Deshundra's pregnancy with Kendra. She took Deshundra to "about seven" of her prenatal doctor appointments. She did not believe Kenyatta, Kendra's father, went with Deshundra to any of her prenatal doctor appointments. Angela testified that in preparation of Kendra's birth, Angela and her sisters purchased "pretty much everything." They purchased a baby bed, car seat, clothes, diapers, and milk.

¶4.     When Kendra was an infant, she had to go to the hospital because she had an allergic reaction to her formula. Kenyatta did not come to the hospital during this incident. Deshundra's aunt Angela Tate testified that Kendra had several medical problems that required medical attention from doctors and trips to the emergency room. Angela testified that Kenyatta was never present when Kendra was in the  hospital and "any time [Kendra] stayed at the hospital, it was us, the three aunts," and Deshundra's mother, Brenda.

¶5.     Angela went to the hospital when Deshundra went into labor. She testified that she and her sisters were at the hospital for the "eight [or] nine hours" Deshundra was in labor.

---

[2] Deshundra had three aunts: Angela Tate, Sharon Tate, and Patricia Tate.

Angela testified that Kenyatta was not at the hospital when Kendra was born. Angela also testified that after Kendra was born, Kenyatta did not believe Kendra was his child because she was "too light-skinned . . . and [that] he challenged paternity."

¶6.     Deshundra's aunt Patricia Tate also testified. In her testimony, she explained that she saw Deshundra and Kendra "almost every day." She testified that she thought it was "strange" that she never saw Kenyatta take Deshundra to her prenatal visits when she was pregnant with Kendra. Patricia also testified that Kenyatta was not present for "the first two days" after Kendra was born.

¶7.     Kenyatta's mother, Felicia Garfield, was the next witness to testify. She testified that Kenyatta called her and informed her that Kendra was being born. Felicia then went to the hospital and held Kendra. She testified that she thought she "called [Kenyatta] twice" while she was at the hospital to tell Kenyatta she held Kendra, but she did not "know when [Kenyatta] first saw" Kendra.

¶8.     The day before Kendra and Deshundra died, Felicia testified that she was at work when she found out Kendra was going to the hospital because of "some gas and stuff." She left work as soon as she could and sped to the hospital, but she did not arrive before Kendra died. On cross-examination, Felicia was asked if she "told [Kenyatta] that he needed to step up and do more than what he was doing." She responded, "[O]ccasionally, yeah."

¶9.     Kenyatta Garfield was also called to testify. During his testimony he explained that he was not at the hospital when Kendra was born because he was working for his uncle's lawn service "out of town at the time, and [he] couldn't make it to the new baby." He went

4

to the hospital "the next day" and did not sign Kendra's birth certificate because he "didn't feel like [he] had to."

¶10. Kenyatta's paternity was not established until a year after Kendra was born. On February 8, 2018, the Mississippi Department of Human Services filed a complaint to determine paternity. After Kenyatta was served with the complaint, he had the option to legally establish himself as Kendra's father by signing a "Stipulation Agreement." He testified, however, that he required a DNA test be used to prove he was Kendra's father "due to the fact that Deshundra and [Kenyatta] has [sic] a . . . little conflict amongst each other," and he "had a little doubt at one time" that Kendra was his daughter. After an order compelling Kenyatta to submit to genetic testing was entered, the DNA test results confirmed Kenyatta as the father of Kendra. On July 6, 2018, the Court entered a judgment determining paternity.

¶11. Once paternity was established, Kenyatta was ordered to pay $100 a month in child support to Deshundra, but he did not pay it until the next year. His first child support payment was $13.78 in 2019. In 2020 he paid $68.31 in child support. In 2021 he paid $1,859.04 of his $12,000 Paycheck Protection Program in child support. In 2022 he paid $612.22 in child support. Kenyatta testified that he helped buy the necessities for Kendra, such as diapers and formula. On cross-examination, opposing counsel asked Kenyatta, "Isn't it true that if you would lie to the federal government to get PPP funds, that you would lie to this Court today to get a windfall; isn't that true?" Kenyatta responded, "Yeah, that's true."

¶12. Deshundra's aunt Sharon Tate testified that Deshundra and Kendra lived with Sharon

5

at their "family house"[3] until Kendra was two years old.  She testified that Kenyatta never lived at the family house, but he would come by the house for "an hour or two and then somebody would pick him up."

¶13.    During Patricia's testimony, she explained that Deshundra moving out of the "family home"  may "had something to do with" the constant criticism Deshundra received from her family about Kenyatta. Patricia was asked during her testimony whether people in her community considered Kenyatta to be Kendra's father. She responded, "No. Not to my knowledge, no."

¶14.    Kenyatta testified that Deshundra moved out of the family house "just to kept [sic] the contrusion [sic] down between us and the family." Kenyatta testified that he "helped [Deshundra] get into Sunset Apartments." He testified that they "both chipped in on furniture" from Aaron's Rental, and when he "had enough money," he paid the furniture off. In Patricia's testimony, however, she explained Deshundra "got from Aaron's Furniture, and she paid for that."

¶15.    Kenyatta testified that he "stayed . . . back and forth between" the apartment and his mother's house in Ruleville, Mississippi. Deshundra's aunt Sharon, however, testified that "[i]t was just Deshundra and [Kendra]" living at the Sunset Village apartment and Kenyatta only spent "one night" "[o]r two" there. Even though Kenyatta's living arrangements were split between the Sunset Village apartment and his father's home in Ruleville, he testified that he spent time alone with Kendra "all the time" and spent "about four days out of the

---

[3] The family house is where the four Tate sisters grew up. Sharon "resides at the family house the most." However, Brenda, Deshundra, and Kendra also lived in this house.

6

week" with Kendra. He testified that they would spend "mostly every other holiday" together. Kenyatta testified that he and Kendra spent Thanksgiving and Christmas together and that he bought Kendra Christmas presents. Kendra's fifth birthday was celebrated with a party at Kenyatta's father's house in Drew, Mississippi. Kenyatta testified that he did not attend the birthday party because he did not want to be a "conflict to the party" since there was "always . . . an altercation at every party," and he "wanted [Kendra] to enjoy the party." Kenyatta testified that he "paid for all the parties." He paid for Kendra's fifth birthday party at his father's house, split the price of the pizza with Deshundra at Kendra's first birthday party, and he "helped a little bit" with her third birthday party. Deshundra's aunt Patricia, however, testified that she was "positive" Kenyatta did not take Kendra to his side of the family for Easter, Thanksgiving, or Christmas because "most of the time Kendra was with [Deshundra's family]."

¶16.   Patricia also testified that she had no knowledge of Kenyatta bringing Kendra to school, but Kenyatta testified that he would take and pick up Kendra from school and that he was listed as an emergency contact for Kendra's school. A photo of Kenyatta and Kendra was brought into evidence that showed Kenyatta and Kendra at her kindergarten graduation.

¶17.   One of Kendra's teacher aides at Kendra's school in Cleveland, Mississippi, testified that she never saw Kenyatta drop or pick up Kendra at school. The teacher aide also testified that Deshundra attended both "Muffins for Mom" and "Donuts for Dad" at Head Start and Kenyatta did not attend either school function.

7

¶18.    Kenyatta's father Jerome Shaw testified.[4] Jerome was the alderman in Drew, Mississippi. He testified that as an elected official, he knew the public was aware that Kendra was Kenyatta's daughter. He testified that Kenyatta regularly stayed at Sunset Village Apartments and Jerome had picked up Kenyatta from that apartment "about six or seven times." Jerome saw Kendra "about three times a month" when "Kenyatta would bring her to [Jerome's] house." He testified that a "majority of the time" Kenyatta would bring Kendra to Jerome's house by himself, but "sometimes it would be" Kenyatta, Kendra, and Deshundra. Jerome testified that Kenyatta and Kendra celebrated Thanksgiving, Christmas, and Independence Day together. Kenyatta's aunt Vicki Williams testified that she wrapped Christmas presents that Kenyatta bought for Kendra. She also testified that Kendra "loved [Kenyatta] to death. [Kendra] saw no fault in her father."

¶19.    Kenyatta's cousin Roderick Shaw testified he spent "about 85 percent of [his] time" with Kenyatta and Kenyatta spent "about 90 percent of the time" with Kendra. Roderick would drive Kenyatta to the store where he observed Kenyatta purchase "[m]ilk, Pampers, [and] clothes" for Kendra" Roderick testified that Kenyatta publicly acknowledged that Kendra was his daughter and that "he bragged on it" by posting her on his Facebook account.

¶20.    Deshundra also posted on her Facebook account. She posted for Kenyatta on Father's Day. The post read:

> I want to say Happy Father's Day to the best half of my headache, my daughter, her twin, other half. We love you to the moon and back. It is unconditional love over this way. You already know what it is. Family over

---

[4] On cross-examination, Jerome testified that he is not Kenyatta's biological father, but he "raised him from birth."

everything. Kenyatta Garfield.

¶21.    Deshundra's father Cornell Nash was called to testify. Cornell lived in Chicago, Illinois. He was "very close" to Deshundra and she would call him "everyday." He testified that Deshundra "wasn't happy" because Kenyatta "wouldn't keep a job," Kenyatta "wasn't there financially, he wasn't there being a father to [Kendra]." Nash would send Deshundra money to help support her. On cross-examination, Cornell testified that he visited Mississippi twice between the time Kendra was born and the time she died.

¶22.    On August 29, 2022, Kendra passed out due to a gas leak at Sunset Village Apartments. Deshundra called an ambulance and Kendra was taken to the hospital. Patricia, Sharon, and Angela met Kendra and Deshundra at the hospital. Kendra and Deshundra died the next day at the hospital.

¶23.    Patricia testified that she saw Kenyatta drive to the hospital the evening Kendra died. Patricia explained that she saw Kenyatta get out of the car and talk to her sister Angela. Angela informed Kenyatta that Kendra died. Patricia testified that "the next thing [she] saw was [Kenyatta] get in the car and he left."

¶24.    Kenyatta testified that when he was informed that Kendra was ill in the hospital, he "immediately left" Ruleville, Mississippi, to go to the hospital in Cleveland, which was about ten minutes away. Upon Kenyatta's arrival to the hospital, Kendra was already deceased. After Kendra and Deshundra's passing, he asked Deshundra's family how he could help with the funeral arrangement, but "they had already worked on all of the arrangements." Therefore, he did not participate in planning the funeral, but he was a pallbearer for Kendra.

9

¶25. During Deshundra's aunt Angela's testimony, she explained that Kenyatta was told that his family was "free to come" to the funeral home to make the funeral arrangements on Wednesday with the Tate family. Angela also testified that she exchanged numbers with Kenyatta and they "text back and forth." The morning the Tate family went to the funeral home, they "waited an additional two hours to plan [the] funeral" because they were waiting on Kenyatta's family, but Kenyatta and his family never showed up.

¶26. Kenyatta testified that on the day of the funeral he was 30 minutes late because "the time was changed" by Deshundra's family. Sharon, however, testified that Kenyatta "was told the true time of the funeral" but he showed up 39 minutes late and "did not come to the viewing" the day before the funeral. Kenyatta's cousin Roderick Shaw testified that the reason Kenyatta was late to Kendra's funeral was because they "had to get him together" because "[h]e was distraught."

¶27. On October 18, 2023, the chancery court entered a final judgment that stated Kenyatta "shall not inherit from Kendra N. Tate pursuant to the requirements set forth under Mississippi Code Annotated section 91-1-15(3)(d)(i)" based on the factual findings that Kenyatta did not

> 1. Initially believe Kendra was his daughter[.]
> 2. Attend any prenatal visits or contribute financially to any of Kendra's birth expenses. These expenses were bore by the taxpayers of the State of Mississippi through the Medicaid Program[.]
> 3. Secure and maintain employment despite being an able bodied male.
> 4. Arrive at the hospital until two days after Kendra's birth.
> 5. Openly acknowledge or hold Kendra out to the public as his daughter by legal means as he did with his older child.
> 6. Sign Kendra's birth certificate to legitimate her as he did with his older child.

7. Purchase any prenatal or postnatal supplies, such as car seats, clothes, cribs, diapers, etc.

8. Attend any of Kendra's doctor visits, including both planned and emergency visits[.]

9. Attend any school functions of Kendra's during her lifetime, with the sole exception to arrive late at her head start graduation.

10. Voluntarily or regularly pay Court ordered child support.

11. Arrive at the hospital the day of Kendra's death despite being aware that she was en route to the hospital.

12. Arrive at the hospital the day before Kendra's death after she had lost consciousness.

13. Participate in the planning or funding of Kendra's funeral.

14. Offer to reimburse the Tate family for any of Kendra's funeral expenses[.]

15. Arrive at Kendra's funeral until thirty-nine (39) minutes after the start of services.[5]

The chancellor found that Kenyatta did not hold Kendra out to the public as his child. The chancellor also found that Kenyatta refused to neglect or support Kendra. Kenyatta appealed the chancery court's judgment claiming the court erred when it found that Kenyatta should be disinherited as the child's heir pursuant to section 91-1-15(3)(d)(i).

## STANDARD OF REVIEW

¶28.   "[I]n ruling on a chancellor's determination on the issue of whether a father has openly treated an illegitimate child as his own[, that determination] '**may only be treated as a finding of fact**. . . .'" *Bullock v. Thomas*, 659 So. 2d 574, 576 (Miss.1995) (emphasis added) (quoting *In re Est. of Ford*, 552 So. 2d 1065, 1068 (Miss.1989)). The chancellor is the fact-finder when resolving disputes and "is the sole judge of the credibility of witnesses." *Murphy v. Murphy*, 631 So. 2d 812, 815 (Miss.1994); *Polk v. Polk*, 559 So. 2d 1048, 1049

---

[5] The chancellor's findings of fact differ from portions of Kenyatta's testimony because, as the ultimate fact finder, she found the other witnesses' testimony to be more credible than Kenyatta's.

11

(Miss.1990). The chancellor's finding will be reversed only if it was "manifestly erroneous or unsupported by substantial evidence in the record." *In re Est. of Ford*, 522 So. 2d at 1068 (citing *Leard v. Breland*, 514 So. 2d 778, 781 (Miss.1987); *Lovett v. E.L. Garner Inc.*, 511 So. 2d 1346, 1349 (Miss.1987)).

## ANALYSIS

¶29. The Mississippi Supreme Court established that the natural father of an illegitimate child can inherit under the wrongful death statute only if the father meets the requirements of Mississippi Code Annotated section 91-1-15. *In re Est. of Patterson v. Patterson*, 798 So. 2d 347, 350 (¶17) (Miss. 2001). Under section 91-1-15(3)(d), "[t]he natural father of an illegitimate [child] . . . shall not inherit . . . [f]rom or through the child unless the father has openly treated the child as his, and has not refused or neglected to support the child." In addition, under Mississippi Code Annotated section 11-7-13 (Rev. 2018), the natural father of an illegitimate child may not recover for the wrongful death of the child unless he "has or establishes the right to inherit from the [child] under Section 91-1-15." Therefore, the natural father of an illegitimate child must satisfy the requirements of section 91-1-15(3)(d) before he may inherit from the child or recover as a wrongful death beneficiary of the child.

¶30. In *Bullock v. Thomas*, 659 So. 2d 574, 578 (Miss. 1995), the Mississippi Supreme Court held that a father did not meet the requirements to inherit from his illegitimate child pursuant to 91-1-15(3)(d)(i). In *Bullock*, Mario Thomas and his mother, Linda Thomas, died in an automobile accident. *Id.* After their death, Mario's father Matthew Bullock instituted a wrongful death action against Illinois Central Railroad Company alleging that he was the

12

natural father, legal heir, and statutory wrongful death beneficiary of Mario Thomas. *Id.* at 575. Bullock petitioned for determination of paternity and heirship. *Id.* The trial court determined that Bullock proved he was Mario's biological father, but failed to prove he had openly treated Mario as his child, and he neglected to support Mario pursuant to section 91-1-15(3)(d)(i). The lower court made that decision based on the following facts. First, Bullock "did not see the child until two days after Linda and the child had returned from the hospital." *Id.* at 577. Second, Bullock's wife did not know about Mario "for approximately one year after his birth." *Id.* Bullock also did not visit Mario on either of his first two birthdays. *Id.* Third, Bullock only occasionally took Linda and Mario to the zoo and lunch and the Mississippi Supreme Court stated that "[o]penly treating a child as one's own encompasses more than showing up at the mother's house on occasion to take the mother and the child sightseeing and shopping." *Id.* Lastly, Bullock did not attend Mario's funeral. *Id.* The Supreme Court affirmed the chancellor's decision that Bullock should not inherit from his illegitimate child because Bullock failed to prove that he openly treated Mario as his own, and that he refused or neglected to support Mario pursuant to section 91-1-15(3)(d)(i).

¶31.    In *In re Estate of Patterson v. Patterson*, 798 So. 2d 347, 351 (¶18) (Miss. 2001), the Mississippi Supreme Court again affirmed a chancellor's judgment denying a father's heirship because he did not prove that he supported the child. In *Patterson*, Jaquarius Patterson was the son of the unmarried couple, Juan McMillian and Quivoria Patterson. *Id.* at 348 (¶¶2, 5). When Quivoria informed Juan she was pregnant, he did not believe the baby was his. *Id.* at 348 (¶6). He told Quivoria that "'when the blood tests came back' that they

13

would 'talk then.'" *Id.* The blood test confirmed that Juan was the father. *Id.* Three years after Jaquarius was born, he and Quivoria were killed in a automobile accident, and an action to determine the child's heirs-at-law followed. *Id.* at 384 (¶5). The chancellor found Juan was not an heir at law nor a wrongful death beneficiary of Jaquarius for a multitude of reasons. *Id.* at (¶4). Juan did not know when Jaquarius was born. *Id.* at (¶7). He did not communicate with Quivoria after he was informed that she was pregnant. *Id.* Juan did not provide any financial help for Jaquarius's birth, medical expenses, food, clothing, or funeral expenses. *Id.* Juan also did not give the child birthday or Christmas cards or presents. *Id.* He also did not contact Quivoria or Jaquarius before they died and never acknowledged Jaquarius as his child. *Id.* The Court stated that a "father should not be allowed to receive a windfall simply because he impregnated the child's mother." *Id.* at 351 (¶18). Therefore, the Supreme Court affirmed the chancellor's determination that Juan should not inherit from Jaquarius because he did not openly treat the child as his and refused or neglected to support the child. *Id.* at 384 (¶2).

¶32.    There were sufficient facts to determine that Kenyatta did not openly treat Kendra as his child. Kenyatta was not at the hospital the night Deshundra was in labor nor did he come to the hospital the day Kendra was born because he was working for his uncle's lawn service. This explanation was questionable because Deshundra was in labor at night which is an unusual time to be cutting grass. Furthermore, there was conflicting evidence as to what day Kenyatta finally arrived at the hospital. Kenyatta testified that he showed up the next day while Deshundra's aunts testified that Kenyatta arrived two days after Kendra was born. The

14

chancellor, as the sole judge of the credibility of witnesses, found that Kenyatta arrived to the hospital two days after Kendra was born. Lastly, Kenyatta never signed Kendra's birth certificate and did not support or provide for Kendra in any way before paternity was established a year into Kendra's life. Kenyatta did, however, take Kendra on a trip to Arkansas and was occasionally with Kendra. These facts are analogous with *Bullock*. The father in that case did not see his child until two days after the wife and child got home from the hospital. *Bullock*, 659 So. 2d at 577. Bullock did not hold his child out as his own the public because his common law wife did not know about Mario for approximately one year after his birth. *Id.* Bullock did, however, take his wife and child to the zoo and lunch occasionally, but the Mississippi Supreme Court stated that, "[o]penly treating a child as one's own encompasses more than showing up at the mother's house on occasion to take the mother and the child sightseeing and shopping." *Id.* at 577. Similarly here, Kenyatta did not hold Kendra out to the public as his own by simply taking her on a trip and going over to her house occasionally.

¶33.    There is also sufficient evidence that proved Kenyatta refused to support Kendra. Kenyatta did not help financially in any way before paternity was established. After paternity was established, he was ordered to pay $100 a month in child support, but there were only four child support payments made in Kendra's lifetime. In 2018, Kenyatta did not pay child support. In 2019, Kenyatta paid $13.78 in child support. In 2020, Kenyatta paid $68.31 in child support. In 2021, Kenyatta paid a one-time payment of $1,859.00 in child support. In 2022, Kenyatta paid another one-time payment of $616.22 in child support. The chancellor

15

also found that Kenyatta did not purchase any prenatal or postnatal supplies, such as a car seat, clothes, cribs, or diapers. Kenyatta also did not pay for any of Kendra's medical or funeral expenses. This case is also similar to *Patterson* because in that case the father did not provide any financial help for his child's birth, medical expenses, food, clothing, or funeral expenses even though a DNA test proved that he was the father. *Patterson*, 798 So. 2d at 384 (¶7). We find that the chancellor was not manifestly erroneous in determining Kenyatta shall not inherit from Kendra pursuant to the requirements set fourth under Mississippi Code Annotated section 91-1-15(3)(d)(i), and there was sufficient evidence to prove that Kenyatta did not hold Kendra out to be his child and refused to support her.

## CONCLUSION

¶34. The chancellor determined Kenyatta Garfield did not prove that he should inherit from Kendra. The chancellor properly considered Mississippi Code Annotated section 91-1-15(3)(d)(i)'s requirement that the parent openly treat the child as his and does not refuse or neglect to support the child. We find no reversible error.

¶35. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. ST. PÉ, J., NOT PARTICIPATING.**